Exhibit 3

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

New Bay Capital, LLC,

Petitioner,

v.

VirnetX, Inc.

Patent Owner.

---

IPR2013-00375

Patent 6,502,135
Issue Date: Dec. 31, 2002
Title: AGILE NETWORK PROTOCOL FOR SECURE COMMUNICATIONS
WITH ASSURED SYSTEM AVAILABILITY

---

**PETITION FOR *INTER PARTES* REVIEW
OF U.S. PATENT NO. 6,502,135**

Mail Stop PATENT BOARD
Patent Trial and Appeal Board
United States Patent and Trademark Office
PO Box 1450
Alexandria, Virginia 22313–1450

# TABLE OF CONTENTS

I.  COMPLIANCE WITH FORMAL REQUIREMENTS ...................................... 1
   A.  REAL PARTIES-IN-INTEREST ..................................................... 1
   B.  STANDING .................................................................................. 1
   C.  RELATED MATTERS .................................................................. 1
   D.  NOTICE OF LEAD AND BACKUP COUNSEL .......................... 4
   E.  SERVICE INFORMATION ............................................................ 4
   F.  PROOF OF SERVICE ON THE PATENT OWNER ....................... 5
   G.  FEE ............................................................................................. 5
II.  STATEMENT OF PRECISE RELIEF REQUESTED ........................ 5
III. FACTUAL BACKGROUND .................................................................. 6
   A.  The '135 Patent ......................................................................... 6
   B.  Original Prosecution History of the '135 Patent ......................... 8
IV. CLAIM CONSTRUCTION ................................................................... 8
   A.  Legal Standards ......................................................................... 9
   B.  Proposed Claim Constructions ................................................. 10
V.  FULL STATEMENT OF THE REASONS FOR CANCELLATION OF
CLAIMS ..................................................................................................... 19
   A.  Claims 1, 3, 7 and 8 are Unpatentable Over Kiuchi ..................... 19
   B.  Request 1 – Claims 1, 3, and 7 are Anticipated by Kiuchi and Claim 8 is
Obvious over Kiuchi .................................................................................. 28
    Ground 1. Claim 1 is Anticipated by Kiuchi .................................... 28
    Ground 2. Claim 3 is Anticipated by Kiuchi .................................... 32
    Ground 3. Claim 7 is Anticipated by Kiuchi .................................... 32
    Ground 4. Claim 8 Would Have Been Obvious in view of Kiuchi ... 34
   C.  Request 2 – Claims 1, 3, 7 and 8 are Anticipated by Kiuchi ......... 37
    Ground 5. Claim 1 is Anticipated by Kiuchi .................................... 40
    Ground 6. Claim 3 is Anticipated by Kiuchi .................................... 44
    Ground 7. Claim 7 is Anticipated by Kiuchi .................................... 44
    Ground 8. Claim 8 is Anticipated by Kiuchi .................................... 45
   D.  Request 3 – Claims 1, 3, 7 and 8 are Unpatentable over Dalton in view of
Kiuchi ......................................................................................................... 47
    Ground 9. Claim 1 Would Have Been Obvious over Dalton/Kiuchi ... 51
    Ground 10. Claim 3 Would Have Been Obvious over Dalton/Kiuchi ... 56
    Ground 11. Claim 7 Would Have Been Obvious over Dalton/Kiuchi ... 57

Ground 12. Claim 8 Would Have Been Obvious over Dalton/Kiuchi .............. 58

VI. CONCLUSION ................................................................................................. 59

# TABLE OF AUTHORITIES

**Cases**

*AirCraft Medical LTD. v. Verathon Inc.*, Reexam. Control No. 95/000,161, Appeal 2012-007851, p. 16 (PTAB Dec. 11, 2012) .......................................................... 9

*Data General Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed.Cir.1996) ................... 10

*Garmin Int'l Inc. v. Cuozzo Speed Technologies, Inc.*, IPR2012-00001, Paper 15 (PTAB, Jan. 9, 2013) ........................................................................................... 9

*In re Morris*, 127 F.3d 1048, 1056 (Fed. Cir. 1997) ................................................ 9

*Key Pharmaceuticals v. Hercon Laboratories Corp.*, 161 F.3d 709, 715, 48 USPQ2d 1911, 1916 (Fed. Cir. 1998) ................................................................ 10

*KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 401; 127 S.Ct. 1727, 173 (2007).. 37

*Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir.1998) 9

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005)(en banc)................. 9

*RenishawPLC v. Marposs Societa per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998) .................................................................................................................... 9

*Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282, 96 S.Ct. 1532 (1976) ...................... 37

*VirnetX Inc. and Science Applications International Corporation v. Apple Inc.*, Case No. 6:12cv855 (E.D. Tex.) ......................................................................... 1

*VirnetX Inc. v. Apple Inc.*, Case No. 6:13cv211, (E.D. Tex.) .................................. 1

*VirnetX Inc. v. Cisco Systems, et al.*, Case No. 6:10cv417 ................................... 13

*VirnetX Inc. v. Cisco Systems, et al.*, Case No. 6:10cv417 (E.D. Tex.)................... 1

*VirnetX Inc. v. Cisco Systems, et al.*, Case No. 6:10cv417, (E.D. Tex.)................... 2

*VirnetX Inc. v. Mitel Networks Corp., et al.*, Case No. 6:11cv18, (E.D. Tex.)......... 2

*VirnetX Inc., et al. v. Microsoft Corporation*, Case No. 6:13cv351, (E.D. Tex.)..... 2

*VirnetX Inc.v. Microsoft Corporation*, Case No. 6:07 CV 80 ................................ 12

*VirnetX v. Microsoft Corporation*, Case No. 6:07 CV 80 (E.D. Tex. 2007) .......... 13

*VirnetX, Inc. v. Microsoft Corporation*, Case No. 6:07cv80, (E.D. Tex.)............... 2

*VirnetX, Inc. v. Microsoft Corporation*, Case No. 6:10cv94, (E.D. Tex.) ............... 2

*York Prods., Inc. v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568,1572 (Fed. Cir. 1996)........................................................................................................... 9

**Statutes**

35 U.S.C. §102(b)....................................................................................... 5, 19, 47

35 U.S.C. §103(a)............................................................................................... 5

35 U.S.C. §301(a)(2),(d) .................................................................................... 10

35 USC §317(b).................................................................................................... 3

**Treatises**

18 Susan Bandes & Lawrence B. Solum, Moore's Federal Practice §134-30, at 134-63 (3d ed.1998)................................................................................................ 10

**Regulations**

37 C.F.R. §42.100(b) ............................................................................................ 9

37 C.F.R. §42.15(a) .............................................................................................. 5

## EXHIBIT LIST

| Exhibit | Description |
|---------|-------------|
| 1001. | U.S. Patent No. 6,502,135 to Munger et al. (hereinafter "the '135 Patent) |
| 1002. | Takahiro Kiuchi and Shigekoto Kaihara, "C-HTTP - The Development of a Secure, Closed HTTP-based Network on the Internet," published by IEEE in the Proceedings of SNDSS 1996 (hereinafter "Kiuchi") |
| 1003. | C. I. Dalton and J. F. Griffin, "Applying Military Grade Security to the Internet," published in the Proceedings of JENC8, May 1997 (hereinafter "Dalton") |
| 1004. | W. Richard Stevens, "TCP/IP Illustrated, Volume 1: The Protocols" (Reading, Mass.: Addison-Wesley, 1994), page 187 |
| 1005. | Windows Sockets – An Open Interface for Network Programming Under Microsoft Windows, Version 1.1, January 20, 1993 (copy obtained from http://www.sockets.com/winsock.htm) |
| 1006. | eCOS Reference Manual, Chapter 38, TCP/IP Library Reference, gethostbyname, March 13, 1997 (copy obtained from http://www.ecos.sourceware.org/docs-2.0/ref/net-common-tcpip-manpages-gethostbyname.html) |
| 1007. | U.S. Patent No. 6,449,657 to Stanbach, Jr. et al. (hereinafter "the '657 Patent) |
| 1008. | U.S. Patent No. 6,546,003 to Farris (hereinafter "the '003 Patent) |
| 1009. | Declaration of Russell Housley with Appendices |
| 1010. | Braden, "Requirements for Internet Hosts – Application and Support," Internet Engineering Task Force Request for Comments |

| | |
|---|---|
| | (RFC) 1123, October 1989. |
| 1011. | MS Markman Order 7/30/09 |
| 1012. | Apple Pretrial Proceedings 10/18/12 |
| 1013. | Apple Transcript Morning 10/31/12 |
| 1014. | Apple Transcript Morning 11/1/12 |
| 1015. | Apple Memorandum Opinion and Order 2/26/13 |
| 1016. | Cisco/Apple Memorandum Opinion and Order 4/25/12 |
| 1017. | VirnetX Opening Claim Construction Brief in Apple/Cisco 11/4/11 |
| 1018. | VirnetX Reply Claim Construction Brief in Apple/Cisco 12/19/11 |
| 1019. | Microsoft Transcript Morning 3/9/10 |
| 1020. | Microsoft Transcript Afternoon 3/9/10 |
| 1021. | Definition of VPN (Virtual Private Network) from Computer Desktop Encyclopedia, 9th Edition, The McGraw-Hill Companies, 2001, page 1044 |
| 1022. | The '135 Patent Family |
| 1023. | Definitions of HTML and HTTP from Computer Desktop Encyclopedia, 9th Edition, The McGraw-Hill Companies, 2001, pp. 435-436 |
| 1024. | C. I. Dalton and J. F. Griffin, "Applying Military Grade Security to the Internet," republished in Computer Networks and ISDN Systems, Vol. 29, No. 15, November 1, 1997 (pp. 1799-1808) (hereinafter "Dalton") |

# I.    COMPLIANCE WITH FORMAL REQUIREMENTS

## A.    REAL PARTIES-IN-INTEREST

Petitioner, New Bay Capital, LLC ("New Bay" or "Petitioner"), requests

inter partes review for claims 1, 3, 7 and 8 of U.S. Patent No. 6,502,135 (the "'135

patent," attached as Ex.1001). The assignee of the '135 patent is VirnetX, Inc.

Petitioner certifies that the real parties-in-interest are New Bay and its parent

Eastern Shore Capital, LLC.

## B.    STANDING

Petitioner certifies that the '135 patent, issued on December 31, 2002, is

available for inter partes review and that Petitioner is not barred or estopped from

requesting an inter partes review challenging the claims of the '135 patent.

## C.    RELATED MATTERS

Ex.1022 lists pending applications and reexaminations that may be affected

by the outcome of this review.  Furthermore, the '135 Patent has been asserted

against the following companies in the following proceedings:

1. Apple Inc. in: *VirnetX Inc. v. Cisco Systems, et al.*, Case No. 6:10cv417

(E.D. Tex.) filed August 11, 2010; *VirnetX Inc, et al. v. Apple Inc.*, Case No.

6:12cv855 (E.D. Tex.), filed November 6, 2012; and *VirnetX Inc. v. Apple Inc.*,

Case No. 6:13cv211, (E.D. Tex.), filed February 26, 2013.  The District Court in

Case No. 6:10cv417 has entered a Final Judgment finding, *inter alia*, that Apple

infringed claims 1, 3, 7 and 8 of the '135 patent and that such claims were not invalid over Kiuchi, which is asserted in this proceeding based on new arguments and evidence.

2. Also, Cisco Systems, Inc., Aastra USA, Inc., Aastra Technologies Ltd., NEC Corporation, and NEC Corporation of America, in *VirnetX Inc. v. Cisco Systems, et al.*, Case No. 6:10cv417, (E.D. Tex.), filed August 11, 2010.

3. Mitel Networks Corporation, Mitel Networks, Inc., Siemens AG, Siemens Communications, Inc., Siemens Corporation, Siemens Enterprise Communications GmBH &Co. KG, Siemens Enterprise Communications, Inc., and Avaya Inc. in *VirnetX Inc. v. Mitel Networks Corp., et al.*, Case No. 6:11cv18, (E.D. Tex.), filed January 1, 2011.

4. Microsoft Corporation in: *VirnetX, Inc. v. Microsoft Corporation*, Case No. 6:07cv80, (E.D. Tex.), filed February 15, 2007; *VirnetX, Inc. v. Microsoft Corporation*, Case No. 6:10cv94, (E.D. Tex.), filed March 17, 2010; and *VirnetX Inc., et al. v. Microsoft Corporation*, Case No. 6:13cv351, (E.D. Tex.), filed April 22, 2013.

The '135 patent was the subject of Re-examination No. 95/001,269, for which a reexamination certificate issued on June 7, 2011.

The '135 Patent is the subject of two merged pending inter partes reexaminations, 95/001,679 brought by Cisco Systems, and 95/001,682 brought by

2

Apple, Inc., where claims 1, 3, 7 and 8 currently stand rejected. Neither of the pending reexaminations has reached the stage of a Right of Appeal Notice. In these reexaminations, the requestors are contesting all 18 claims of the patent, and have asserted more than a dozen prior art references in various combinations. The present Petition is, by contrast, highly streamlined in that it focuses on only a small subset of claims and relies on two prior art references (i.e., Kiuchi and Dalton). The present Petition advances new arguments and evidence (not presented in the litigations or pending reexaminations) for invalidating claims 1, 3, 7 and 8.

As a result of the cross-collateral estoppel provisions of 35 USC §317(b), the pending reexaminations will likely terminate before either reaches an enforceable result. The District Court in Case No. 6:10cv417 has already entered Final Judgments, finding that each of the requestors (Cisco and Apple) failed to prove the invalidity of the '135 patent. Given that the pending reexaminations have not even reached the stage of a Right of Appeal Notice, it is unlikely that the reexaminations will have time to run their full course (i.e., completing proceedings at the Examiner level, the Board level, and the Federal Circuit level) before the District Court judgments become "final," thereby necessitating termination of the reexaminations under 37 USC 317(b).

Also, the '135 Patent is the subject of two petitions for inter partes review (IPR) filed by Apple on June 12, 2013 (case nos. IPR2013-00348 and IPR2013-

00349). Petitioner expressly requests that Petitioner's IPR **NOT** be joined or consolidated with the newly-filed Apple IPR(s) or otherwise delayed or suspended because (i) Apple's IPRs present a timeliness question that Petitioner's IPR does not present, (ii) Petitioner's IPR asserts different art than the Apple IPRs, and (iii) Petitioner's IPR involves far fewer claims, and, as a result of (i)-(iii), consolidating the proceedings will unduly complicate matters and will place an undue burden on Petitioner to complete its IPR within the 1 year mandate.

Finally, Petitioner is concurrently filing IPR requests directed to related Patent Nos. 7,490,151; 7,418,504; and 7,921,211, and requests that the reviews of the '135 Patent and Patent No. 7,490,151 be assigned to the same Board for administrative efficiency.

### D. NOTICE OF LEAD AND BACKUP COUNSEL

Lead counsel for the Petitioner is Robert M. Asher, Reg. No. 30,445, of Sunstein Kann Murphy and Timbers LLP. Back-up counsel is Jeffrey Klayman, Reg. No. 39,250, of Sunstein Kann Murphy and Timbers LLP.

### E. SERVICE INFORMATION

New Bay may be served through its counsel via email to rasher@sunsteinlaw.com and jklayman@sunsteinlaw.com or otherwise to

> Robert M. Asher
> Jeffrey T. Klayman
> Sunstein Kann Murphy & Timbers LLP
> 125 Summer Street

4

Boston, MA 02110-1618
617 443 9292 (phone)
617 443 0004 (fax)

## F.    PROOF OF SERVICE ON THE PATENT OWNER

A copy of the present Petition, in its entirety, is being served upon the Patent

Owner at the address of its attorney of record.

## G.    FEE

The undersigned authorizes the Director to charge the fee specified by 37

C.F.R. §42.15(a), and any additional fees due in connection with this Petition, to

Deposit Account No. 19-4972.

## II.    STATEMENT OF PRECISE RELIEF REQUESTED

Request 1 – Cancellation of claims 1, 3, and 7 under 35 U.S.C. §102(b) as

being anticipated by Takahiro Kiuchi and Shigekoto Kaihara, "C-HTTP - The

Development of a Secure, Closed HTTP-based Network on the Internet,"

published in the Proceedings of SNDSS 1996 (hereinafter "Kiuchi" –Ex.1002) and

cancellation of claim 8 under 35 U.S.C. 103(a) as being obvious over Kiuchi.

Request 2 – Cancellation of claims 1, 3, 7 and 8 under 35 U.S.C. §102(b) as

being anticipated by Kiuchi.

Request 3 – Cancellation of claims 1, 3, 7 and 8 under 35 U.S.C. §103(a) as

being obvious over C. I. Dalton and J. F. Griffin, "Applying Military Grade

Security to the Internet," published in the Proceedings of JENC8, May 1997,

republished in Computer Networks and ISDN Systems, Vol. 29, No. 15, November 1, 1997 (pp. 1799-1808) (hereinafter "Dalton" –Exs.1003 and 1024) in view of Kiuchi.

## III.   FACTUAL BACKGROUND

### A.   The '135 Patent

As set forth in Ex.1009 ¶¶ 22-27, the '135 Patent relates to automatic creation of a virtual private network (VPN) in response to a domain-name server look-up function (Ex.1001 at 37:19-21). The effective filing date for claims 1, 3, 7 and 8 of the '135 Patent is no earlier than the filing date of the '135 Patent, specifically February 15, 2000. Claims 1, 3, 7 and 8 read as follows:

> 1. A method of transparently creating a virtual private network (VPN) between a client computer and a target computer, comprising the steps of: (1) generating from the client computer a Domain Name Service (DNS) request that requests an IP address corresponding to a domain name associated with the target computer; (2) determining whether the DNS request transmitted in step (1) is requesting access to a secure web site; and (3) in response to determining that the DNS request in step (2) is requesting access to a secure target web site, automatically initiating the VPN between the client computer and the target computer.
>
> 3. The method of claim 1, further comprising the step of: (4) in response to determining that the DNS request in step (2) is not requesting access to a secure target web site, resolving the IP address for the domain name and returning the IP address to the client computer.
>
> 7. The method of claim 1, wherein step (3) comprises the step of using a gatekeeper computer that allocates VPN resources for communicating between the client computer and the target computer.
>
> 8. The method of claim 1, wherein step (2) is performed in a DNS proxy server that passes through the request to a DNS server if it is determined in step (3) that access is not being requested to a secure target web site.

6

Specifically, a DNS request is generated from a client computer to request an IP address corresponding to a domain name that is associated with a web site hosted by a server. A determination is made whether the DNS request is requesting access to a secure web site, e.g., based on a domain name extension, or by reference to an internal table of such sites. (Ex.1001 at 37:63-38:28). When the DNS request corresponds to a secure web site, a VPN is automatically initiated between the client computer and the target computer. (Ex.1001 at 37:64-38:2). When the DNS request does not correspond to a secure web site, a look-up function is performed that returns the IP address of the non-secure web site. (Ex.1001 at 38:6-11).

The '135 Patent discloses various exemplary embodiments for implementing such automatic creation of a VPN. With respect to receiving the DNS request and determining if the request corresponds to a secure web site (e.g., the user is authorized to access the secure web site), a DNS server may perform these steps. (Ex.1001 at 37:64-38:2). In another example, a DNS proxy may receive the DNS requests and perform the determining. (Ex.1001 at 38:23-25). In some embodiments, the DNS proxy may reside on a different machine than the DNS server (Ex.1001 at 38:63-65), and in other embodiments, the DNS proxy and DNS server may be combined in a single machine. (Ex.1001 at 38:61-63).

With respect to creating the encrypted channel (e.g., the VPN), the DNS server may set up the VPN between the client computer and the server. (Ex.1001 at 37:63-38:2). Alternatively, a DNS proxy may send a request to a gatekeeper to create the VPN between the client computer and the server. (Ex.1001 at 39:42-52). The gatekeeper facilitates the allocation and exchange of information needed to communicate securely. (Ex.1001 at 38:55-57, 39:42-52). In any of these examples, the VPN is established without user involvement. As with the DNS proxy and DNS server, the gatekeeper and DNS server may reside on different machines or be combined on a single machine. (Ex.1001 at 38:53-55). By extension, any of the DNS proxy, DNS server, and gatekeeper may be on the same or different machines. With respect to the look-up function, the DNS proxy may send a DNS request to a DNS server, which performs the look-up to return an IP address. (Ex.1001 at 38:43-47). In some embodiments, the gatekeeper instructs the DNS proxy to send the DNS request to the DNS server. (Ex.1001 at 39:61-40:3).

### B.   Original Prosecution History of the '135 Patent

Claims 1, 3, 7 and 8 of the '135 Patent correspond to claims 28, 30, 34 and 35 of the originally-filed patent application. During prosecution of the patent application, these claims were issued without amendment.

## IV.   CLAIM CONSTRUCTION

## A. Legal Standards

The Board interprets a claim by applying its "broadest reasonable construction in light of the specification of the patent in which it appears." 37 C.F.R. §42.100(b). Claim terms are given their ordinary and accustomed meaning as would be understood by one of ordinary skill in the art unless the inventor as a lexicographer has set forth a special meaning for a term. *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir.1998); *York Prods., Inc. v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568,1572 (Fed. Cir. 1996); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005)(en banc). When an inventor acts as a lexicographer, the definition must be set forth with reasonable clarity, deliberateness, and precision. *RenishawPLC v. Marposs Societa per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998)." *Garmin Int'l Inc. v. Cuozzo Speed Technologies, Inc.,* IPR2012-00001, Paper 15 (PTAB, Jan. 9, 2013). The specification has not given special meanings to any of the claim terms whether by express definitions or otherwise. The bounds of a claim should be determined primarily by the claim language. "[I]t is the Patent Owner's burden to precisely define the invention in the claims." *AirCraft Medical LTD. v. Verathon Inc.*, Reexam. Control No. 95/000,161, Appeal 2012-007851, p. 16 (PTAB Dec. 11, 2012) (citing *In re Morris*, 127 F.3d 1048, 1056 (Fed. Cir. 1997)).

9

The Board should be leery of arguments of a party inconsistent with arguments presented in prior litigation. (*Cf., Key Pharmaceuticals v. Hercon Laboratories Corp.*, 161 F.3d 709, 715, 48 USPQ2d 1911, 1916 (Fed. Cir. 1998) ("Ordinarily, doctrines of estoppel, waiver, invited error, or the like would prohibit a party from asserting as "error" a position that it had advocated at the trial."). Given that the Board will apply the broadest reasonable construction, a patent owner such as VirnetX who has successfully argued in court for broad claim interpretations is estopped from advancing narrower constructions in these proceedings. *Cf., Data General Corp. v. Johnson,* 78 F.3d 1556, 1565 (Fed.Cir.1996) ("[W]here a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding ..."); 18 Susan Bandes & Lawrence B. Solum, Moore's Federal Practice §134-30, at 134-63 (3d ed.1998). Instead, those prior statements should contribute to the determination of the proper meaning of the patent claims in this inter partes review. See 35 U.S.C. §301(a)(2),(d) (statements of the patent owner filed in court taking a position on the scope of a patent claim may be used "to determine the proper meaning of a patent claim" in an inter partes review).

## B.     **Proposed Claim Constructions**

Ex.1009 ¶ 21 sets forth a proposed definition of a person of ordinary skill in the art. Petitioner proposes the following constructions:

| Determining | Plain and ordinary meaning – the step of "determining" can be implemented anywhere in the system |
|---|---|
| Domain name | A name corresponding to an IP address or a group of IP addresses |
| Domain name service | A lookup service that returns an IP address for a requested domain name |
| DNS proxy server | A computer or program that responds to a domain name inquiry in place of a DNS |
| DNS request | A communication that contains a domain name and requests an IP address for the domain name |
| Client computer | A computer or program from which a DNS request is generated |
| Transparently | The user need not be involved in creating the secure link |
| Virtual private network or VPN | A private network that is configured within a public network |
| Automatically initiating the VPN | Initiating the VPN without involvement of a user – can involve transmitting a message to request a connection. |
| Passes through the request to a DNS server | Passing a domain name generated by the client computer to a DNS server |
| Secure web site Secure target web site Target computer | Plain and ordinary meanings within the context of the claims, which do not require the secure web site or the secure target web site to be on the same machine as the target computer |
| Gatekeeper computer | One or more programs or devices that allocate VPN resources |
| Allocates VPN resources | Distributes or designates information needed to communicate securely |

A "**client computer**" is "a computer or program from which a DNS request is generated." The "client computer" is defined in claim 1 as the entity from which the DNS request is generated. (Ex.1001 at 47:23-26). VirnetX has admitted that

the client computer can be an application that generates a DNS request, e.g., to an operating system (Ex.1014 at 47-48; see also Ex.1014 at 67-68).

"**Determining**" should be given its plain and ordinary meaning of making a determination. The claim does not specify where this step is performed, and the broadest reasonable interpretation covers implementation of the "determining" at any place in the system. (See Ex.1015 at 5 – 'While the Court has not construed the word "determining," in its claim construction opinion, the Court noted this determining step could be performed by the client computer or by the target computer.'). The doctrine of claim differentiation also supports a construction of "determining" in claim 1 that covers implementation at any place in the system. In contrast to claim 1, claim 2 specifies that "steps (2) and (3) are performed at a DNS server separate from the client computer" and therefore "determining" can be performed at the client computer.

A "**domain name**" means "a name corresponding to an IP address or a group of IP addresses." (Adopted in Ex.1011 at 12-13; adopted in Ex.1016 at 16). The claims make clear that a "domain name" has a corresponding IP address. (Ex.1001 at 47:23-26). The specification describes "domain name" servers as providing a look-up function that returns "the IP address" of a requested computer or host. (Ex.1001 at 37:22-24). In *VirnetX Inc.v. Microsoft Corporation*, Case No. 6:07 CV 80, Virnetx successfully argued that "domain name" was not limited to

"*a hierarchical name for a computer under traditional DNS format*" but instead proposed, and the Court adopted, that a "domain name" is "a name corresponding to an IP address." (Ex.1011 at 12-13). Also, in *VirnetX Inc. v. Cisco Systems, et al.*, Case No. 6:10cv417, the same Court again adopted VirnetX's proposed definition of "domain name" as "a name corresponding to an IP address." (Ex.1016 at 16). Having succeeded in achieving a broad construction of "domain name" in court, VirnetX is estopped from arguing here that the broadest reasonable construction of "domain name" is any narrower than "a name corresponding to an IP address."

A "**domain name service**" is "a lookup service that returns an IP address for a requested domain name." The specification states: 'Conventional Domain Name Servers (DNSs) provide a look-up function that returns the IP address of a requested computer or host.' (Ex.1001 at 37:22-24). In *VirnetX v. Microsoft Corporation*, Case No. 6:07 CV 80 , VirnetX successfully argued that "domain name service" is not limited to "*the conventional lookup service defined by the Internet Engineering Task Force (IETF) that returns the IP address of a requested computer or host*" but is merely "a look-up service that returns an IP address for a requested domain name." (Ex.1011 at 11-12). Also, in *VirnetX Inc. v. Cisco Systems, et al.*, Case No. 6:10cv417, the same Court again adopted Virnetx's definition of "domain name service" as "a look-up service that returns an IP

13

address for a requested domain name." (Ex.1016 at 14-15). Having succeeded in achieving a broad construction of "domain name service" in court, VirnetX is estopped from arguing here that the broadest reasonable construction of "domain name service" is any narrower than "a look-up service that returns an IP address for a requested domain name."

A "**DNS proxy server**" is "a computer or program that responds to a domain name inquiry in place of a DNS." (Proposed by VirnetX in Ex.1017 at 16; adopted by Ex.1016 at 16-17). The '135 Patent makes clear that functions of the DNS proxy server can be combined on the same server with those of the DNS or can operate independently of the DNS server (see Ex.1001 at 38:61-65).

Under the broadest reasonable interpretation of the claims, the DNS proxy server can be a function in the same computer as the client computer. VirnetX took the position in the Microsoft case (and the court agreed) that a "DNS proxy server" can be a "computer or program" and that "the DNS proxy server does not have to be separate from the client computer." (Ex.1011 at 24). Similarly, in the Apple case, VirnetX continued to assert that the DNS proxy server can be a software module in the same computer as the client computer. For example, VirnetX admits that the DNS request generated (and transmitted) from the client computer can be "from one software module on the computer to another software module on the device that makes the determination." (Ex.1012 at 209).

14

Furthermore, one of the inventors (Dr. Short) testified that "we came to realize fairly early on that what you really want to do is put this DNS proxy software in your computer so that way every computer that's enabled to do this has its own proxy, and you don't have to have all these servers out there." (Ex.1013 at 92-93). Also, VirnetX's expert, Dr. Jones, supported this construction by testifying that "The DNS request is generated in the application, for example, Safari and is passed through an API call to iOS." (Ex.1014 at 47-48; see also Ex.1014 at 67-68). The '135 Patent makes clear that the DNS proxy server "handles requests for DNS look-ups" (Ex.1001 at 38:66-67) and if access to a secure host was not requested "the DNS request is passed to conventional DNS server 2609, which looks up the IP address of the target site and returns it to the user's application for further processing" (Ex.1001 at 39:3-6). Thus, "responding to a DNS inquiry in place of a DNS" can involve a lookup to a domain name service to obtain an IP address.

A "**Domain Name Service (DNS) request**" is "a communication that contains a domain name and requests an IP address for the domain name." The DNS request is not limited to any particular protocol and can be internal to a computer from one software module to another software module. In litigation against Apple, VirnetX succeeded in proving infringement by arguing that the DNS proxy server (which, in claim 8, determines whether the DNS request generated in step (1) is requesting access to a secure web site) can be a software

module in the same computer as the client computer and therefore that the DNS request generated (and transmitted) from the client computer can be "from one software module on the computer to another software module on the device that makes the determination." (see Ex.1012 at 209). By at least 1997, it was well-known for a client function of a client computer (e.g., an application such as a web browser) to request domain name resolution from a resolver function in the client computer. For example, client applications running on Windows and Unix operating systems made function calls to the operating system (specifically, the "gethostbyname" function) in order to obtain an IP address for a given hostname (see Ex.1004 – "From an application's point of view, access to the DNS is through a resolver .... The [gethostbyname(3) library function] takes a hostname and returns an IP address...The resolver contacts one or more name servers to do the mapping"). Ex.1005 at 112 describes error return codes from gethostbyname() and gethostbyaddr() library functions "when using the resolver." Ex.1006 describes the gethostbyname eCos system library function. Ex.1007 at 2:63-3:8 states that "When a user program, such as the browser, requests information ... a resolution request is passed in the form of a query to the resolver." Ex.1008 at 9:49-54 states that "Access to the DNS is through a resolver and software library functions. The function in this case takes a domain name or host name and returns an IP address." Thus, under the broadest reasonable interpretation, a DNS request can include the

domain name passed from one software module to another software module, e.g., through an internal message or function call.

A "**virtual private network**" or "**VPN**" is not defined in the '135 Patent and should be given its plain and ordinary meaning, e.g., "a private network that is configured within a public network." (Ex.1021).

The term "**automatically initiating the VPN**" means "initiating the VPN without involvement of a user." (Ex.1011 at 21). The '135 Patent provides, as an example of "automatically initiating the VPN," transmitting "a message to the gatekeeper requesting that a VPN be created…" (see Ex.1001 at 38:30-33). Therefore, "automatically initiating the VPN" includes sending a message from one entity to another entity to cause automatic initiation of the VPN.

The term "**passes through the request to a DNS server**" means "passing a domain name generated by the client computer to a DNS server." The domain name may be received in one format and transmitted to the DNS server using another format. This construction is necessitated by the construction of "DNS proxy server" as a function that can be performed in the same computer as the client computer, as discussed above. In such a construction, the DNS request received by the DNS proxy server can be a domain name received via an internal message or function call from an internal client. As discussed above, a DNS request may begin as a domain name that is generated by a client application and

17

sent to a DNS proxy server via an internal message or function call. The domain name is sent to a domain name service in a DNS (request) protocol format. Nevertheless, common to the formats of these DNS requests is the domain name that is the subject of the requests. Hence, passing through the DNS request means passing a domain name sent by the client.

"**Transparently**" is defined in the '135 Patent to mean "the user need not be involved in creating the secure link." (Ex.1001 at 39:26-29). Furthermore, the term is found in the preamble and is not a limitation in the claim. If it were, it would require that the user not be involved in creating the VPN. (Ex.1011 at 10-11).

"**Secure web site**," "**secure target web site**," and "**target computer**" should be given their plain and ordinary meanings within the context of the claims, which do not require the secure web site or the secure target web site to be on the same machine as the target computer but only require the domain name that is the subject of the DNS request to be "associated with the target computer."

A "**gatekeeper computer**" means "one or more programs or devices that allocate VPN resources." The '135 Patent makes clear that the gatekeeper computer can be a separate server or can be implemented as function (or program) on another server (Ex.1001 at 38: 53-55). The Patent Owner has asserted that a gatekeeper is "a piece of software, can be a separate computer, doesn't have to be,

just a piece of software ..." (Ex.1019 at 61-62, testimony of Dr. Short, named inventor). For example, the Patent Owner asserted that the gatekeeper computer may be software running on the secure web computer. (Ex.1020 at 117-118, noting that the "Office Communications Server" software is both the gatekeeper computer and the secure web computer). Thus, the gatekeeper computer can be software running on the DNS server, the target computer, or a separate computer.

The term "**allocates VPN resources**" means "distributes or designates information needed to communicate securely." (Ex.1001 at 38:55-57; "In general, it is anticipated that gatekeeper 2703 facilitates the allocation and exchange of information needed to communicate securely....").

## V.    **FULL STATEMENT OF THE REASONS FOR CANCELLATION OF CLAIMS**

### A.    **Claims 1, 3, 7 and 8 are Unpatentable Over Kiuchi**

Kiuchi was presented at the 1996 Symposium on Network and Distributed Systems Security (SNDSS), and published by IEEE in the Proceedings of SNDSS 1996. Mr. Russell Housley, who was also among the speakers at the Symposium, confirms that the Kiuchi paper was presented to the Symposium on Network and Distributed Systems Security (SNDSS) in 1996, and the paper was published in the symposium proceedings, distributed to the participants, and made available to the public. (Ex.1009 ¶ 28). Thus, Kiuchi is prior art pursuant to 35 U.S.C. §102(b).

As set forth in Ex.1009 ¶¶ 29-43, Kiuchi was concerned with establishing secure network links between different hosts on the Internet. In particular, the service was contemplated for use by medical institutions for private information, although Kiuchi makes clear that the closed virtual network can be used in other areas (Ex.1002 at 69, paragraph 5). The following Figure 1 shows the relevant components of Kiuchi's system:



Figure 1 – Kiuchi Schematic Block Diagram

Kiuchi creates a closed network over the Internet (referred to as the "C-HTTP" system) that allows a user agent computer to access private web pages (HTML documents) stored on an origin server (i.e., a "secure target web site") in the closed network. The user agent and origin server are members of the closed network constructed over the Internet using a client-side proxy that performs proxy functions for the user agent and a server-side proxy that performs proxy functions for the origin server. The client-side proxy and server-side proxy are installed in

firewall devices situated between the user agent and the origin server, which are unaware of these proxies. (see Ex.1002 at 64, sec. 2.1).

The user agent and the origin server are conventional HTTP/1.0 compatible devices, e.g., "[c]ommunications between two kinds of proxies and *HTTP/1.0 compatible servers/user agents within the firewalls* are performed based on HTTP/1.0." (Ex.1002 at 64, sec. 2.1, emphasis added). It is well-known that HTTP is the communication protocol used to connect to servers on the World Wide Web. (Ex.1023 at 436). Kiuchi shows an example in which a web page (HTML document) is sent from origin server to client-side proxy (see Ex.1002 at 66, Figure (a)). The client-side proxy sends a rewritten version of the HTML document with modified links (URLs or resource names) to the user agent (see Ex.1002 at 66, Figure (b)). An end-user is able to select and request a modified link in order to generate an HTTP GET request for the requested web page (see Ex.1002 at 65, sec. 2.3(a); Ex.1002 at 66, Figure (c)(1)). Thus, it is clear that Kiuchi is providing access to private web pages at a secure target web site (i.e., the origin server).

The client-side proxy and server-side proxy work in conjunction with a C-HTTP name server over the Internet. (Ex.1002 at 64). For permitted secure communications, the C-HTTP name server is the server that responds to name service requests by looking up domain names and returning their IP address and related VPN resources, i.e., public key and Nonce values (Ex.1002 at 65, sec.

2.3(2)). Each proxy is registered with the C-HTTP name server, including a hostname, IP address, and public key for the proxy. (Ex.1002 at 65, sec. 2.2). The hostname (domain name) of the server-side proxy is used to access web pages at an origin server being proxied by the server-side proxy. For non-secure connections, a conventional DNS name service is used to return IP addresses. *Id.* Thus, domain name services are provided by the C-HTTP name server for secure communication requests and by a conventional DNS for non-secure communication requests.

Petitioner presents the following Figure 2 to schematically show relevant functions performed in Kiuchi's system, where the dashed arrows represent communications that occur at least in part over the Internet:



**Figure 2 - Functional Diagram of Kiuchi**

The client-side proxy receives, from the user agent, an HTTP request specifying a web page (HTML document) stored at the origin server and associated with a given URL. The URL in the HTTP request has the format "http://<hostname>/<web page>[connection ID]" (see the sample URL at Ex.1002 at 65, sec. 2.3(1), where "server.in.current.connection" is the hostname (i.e., "domain name") of the server-side proxy, "sample.html" is a web page stored on the origin server being proxied by the server-side proxy, and "6zdDfldfcZLj8V!i" is an optional connection ID).

In order to create a VPN, the client-side proxy first determines whether the HTTP request is directed to a secure target web site in the closed network. Specifically, the client-side proxy "asks the C-HTTP name server whether it can communicate with the host specified in [the] URL" (Ex.1002 at 65, sec. 2.3(2)), specifically by "[taking] off the connection ID and [forwarding] the stripped, the original resource name to the server in its request" to the name server. (Ex.1002 at 65, sec. 2.3(1)). Thus, the client-side proxy extracts the domain name from the HTTP request and sends the requested domain name to the C-HTTP name server to request the IP address of the host. The name server returns an IP address only if a secure connection with that host (i.e., server-side proxy) is permitted. (Ex.1002 at 65, sec. 2.3(2)). Along with the IP address, the C-HTTP name server also returns the public key of the server-side proxy and Nonce values. *Id.*

The client-side proxy uses the public key and Nonce values to create a secure communication connection (i.e., VPN) with the server-side proxy (Ex.1002 at 65, sec. 2.3(3)). When the server-side proxy receives the client-side proxy's IP address, the hostname and public key, it authenticates the values and generates a connection ID as well as a second key for response encryption (Ex.1002 at 65-6, sec. 2.3(4)). When these are accepted and checked by the client-side proxy, the secure communication connection is established (Ex.1002 at 66, sec. 2.3(5)).

Security between the proxies is made possible by the public key and Nonce values provided by the C-HTTP name server.

Once the secure communication connection is established, when the user agent sends an HTTP request to access a secure web page on the origin server (e.g., the HTTP request shown in Ex.1002 at 66, Figure (c)(1)), the client-side proxy forwards the request (e.g., the HTTP request shown in Ex.1002 at 66, Figure (c)(2)) to the server-side proxy in encrypted form using a C-HTTP format. (Ex.1002 at 66, sec. 2.3(6). The server-side proxy communicates with the origin server using HTTP/1.0. Because the hostname in Kiuchi is used to refer to both the server-side proxy and the secure target web site (i.e., origin server) of the requested web page, "[f]rom the view of the user agent or client-side proxy, all resources appear to be located in a server-side proxy on the firewall. In reality, however, the server-side proxy forwards requests to the origin server. It is possible to map any of the virtual directories on the server-side proxy to any of the directories in one or more origin servers inside the firewall." (Ex.1002 at 66, sec. 2.3(7)). Thus, while the origin server is the "secure target web site" being accessed, the server-side proxy is the "target computer" through which access to the secure target web site is provided and to which the VPN is created.

If a secure connection with the requested host is not permitted, the name server instead returns an error status to the client-side proxy. (Ex.1002 at 65, sec.

2.3(2)). The client-side proxy then acts exactly like "an ordinary HTTP/1.0 proxy"; it sends a standard domain name service lookup request asking for the corresponding IP address from a conventional public DNS server. *Id.* Once the IP address is obtained, a typical non-secure communication may take place.

In Kiuichi, the request sent by the client-side proxy to the C-HTTP name server meets the "domain name service request" limitations as recited in claim 1 because the request is a communication that contains a domain name and requests an IP address for the domain name. If the domain name included in the request corresponds to a host that is a member of the closed network, the C-HTTP name server similarly provides a "domain name service" because it provides a lookup service that returns an IP address for the requested domain name. To the extent that Kiuchi makes statements that "DNS" is not used in the C-HTTP system (e.g., "In a C-HTTP-based network, instead of DNS, a C-HTTP-based secure, encrypted name and certification service is used" and "The DNS name service is not used for hostname resolution as the original secure name service, including certification, is used for the C-HTTP-based network" – Ex.1002 at 64)), Kiuchi is simply explaining that a C-HTTP name service, as opposed to a conventional DNS (i.e., as defined by the Internet Engineering Task Force (IETF)), is used for resolving IP addresses in the closed network. Since the broadest reasonable interpretation of "domain name service" is not limited to the conventional lookup

26

service as defined by the IETF, these statements in Kiuchi do nothing to diminish the fact that Kiuchi's C-HTTP name server is a "domain name service" within the meaning of the claims.

As explained above, the broadest reasonable constructions of several elements claimed in the '135 Patent – e.g., client computer, DNS proxy server, target computer, and gatekeeper computer – encompass implementation of such elements in software modules. Such software modules can reside on separate machines or be combined in ways where various functions reside on the same machine. For example, the '135 Patent makes clear that the DNS proxy and DNS server can be combined into a single server. (Ex.1001 at 61-63). This is the nature of software, where developers generally have great leeway in how to divide functions into software modules and where to place the software modules. Dr. Short (an inventor of the '135 Patent) testified to this very point at trial, when asked: "Does this mean in order to practice your invention, we would have to buy servers to act as the DNS proxy and put those out in various places on the Internet?" His answer was: "*No, not at all. ... [W]hat you really want to do is put this DNS proxy software in your computer so that way every computer that's enabled to do this has its own proxy.*" (see Ex.1013 at 92-93). Kiuchi also teaches to an ordinarily skilled artisan that the functions of a "DNS proxy server" can be included in the same machine as the client computer (i.e., the client-side

proxy machine) or in a DNS server such as the C-HTTP name server, and that the functions of a "gatekeeper computer" can be included in the server-side proxy or the C-HTTP server.

### B.     Request 1 – Claims 1, 3, and 7 are Anticipated by Kiuchi and Claim 8 is Obvious over Kiuchi

For purposes of this analysis, the client-side proxy is the "client computer," and the server-side proxy is the "target computer." In response to receiving an HTTP request from the user agent, the client-side proxy sends a DNS request to the C-HTTP name server. The DNS request, which contains the domain name from the HTTP request (i.e., the hostname given to the server-side proxy), requests the IP address of the server-side proxy (i.e., "the IP address corresponding to a domain name associated with the target computer") for the purpose of allowing access to a specified web page on the origin server (i.e., the "secure web site"/"secure target web site"). The C-HTTP name server and the client-side proxy each performs "determining" and/or "automatically initiating" steps based on whether the DNS request is requesting access to a secure target web site in the C-HTTP closed network.    A VPN is automatically initiated between the client-side proxy and the server-side proxy if the DNS request is requesting access to a secure target web site.

### Ground 1. Claim 1 is Anticipated by Kiuchi

As set forth in Ex.1009 ¶¶ 29-39 and Appendix C, Kiuchi discloses all of the limitations of claim 1.

Step (1) of Claim 1 - When the client-side proxy (i.e., the "client computer") receives the HTTP request from the user agent, it generates (and transmits) a DNS request that is sent to the C-HTTP name server in the form of a C-HTTP name service request to ask the C-HTTP name server whether it can communicate with the specified host. (Ex.1002 at 65, sec. 2.3(2)). The C-HTTP name service request is a "DNS request" because it is a communication that contains a domain name (i.e., the hostname from the URL in the HTTP request) and requests an IP address for the domain name. Because the domain name sent in the DNS request is the hostname given to the server-side proxy, the domain name is literally "associated with the target computer" as required by the claim. Therefore, the DNS request "requests an IP address corresponding to a domain name associated with the target computer" as required by step (1). The client-side proxy is a "client computer" because it is a computer from which the DNS request is generated and transmitted.

Step (2) of Claim 1 - Upon receiving the C-HTTP name service request (i.e., DNS request) from the client-side proxy, the C-HTTP name server "examines whether the requested server-side proxy is registered in the closed network." (Ex.1002 at 65, sec. 2.3(2)). The C-HTTP name server determines whether the DNS request transmitted by the client-side proxy in step (1) is requesting access to

a secure web site based on whether the requested server-side proxy is registered in the closed network. The C-HTTP name server determines that access is being requested to a secure web site being proxied by the server-side proxy (i.e., that access is being requested to a "secure web site"/"secure target web site") and sends a C-HTTP name service response to the client-side proxy containing "the IP address and public key of the server-side proxy and both request and response Nonce values" (Ex.1002 at 65, sec. 2.3(2)), if the requested server-side proxy is registered in the closed network. The C-HTTP name server determines that access is not being requested to a secure web site and sends "a status code which indicates an error," if the requested server-side proxy is not registered in the closed network. (Ex.1002 at 65, sec. 2.3(2)-(3)). Thus, step (2) of claim 1 is satisfied by the determination made by the C-HTTP name server.

Additionally, step (2) of claim 1 is satisfied by a determination made by the client-side proxy based on the type of response received from the C-HTTP name server. In particular, the client-side proxy determines that access is being requested to a secure web site being proxied by the server-side proxy (i.e., that access is being requested to a "secure target web site"), only if a C-HTTP name service response is returned, and determines that access is not being requested to a secure web site, if the response is an error status status.

Step (3) of Claim 1 - As discussed above for step (2), if the C-HTTP name server determines that the requested server-side proxy is registered in the closed network and therefore determines that access is being requested to a secure target web site, the C-HTTP name server sends a C-HTTP name service response to the client-side proxy. The sending of the C-HTTP name service response by the C-HTTP name server to the client-side proxy constitutes "automatically initiating the VPN" within the context of the claim because the C-HTTP name service response causes the client-side proxy to send a request for connection to the server-side proxy. (Ex.1002 at 65, sec. 2.3(3)). The '135 Patent provides, as one example of automatically initiating the VPN, transmission of a message requesting that a VPN be created (see Ex.1001 at 38:30-33). The C-HTTP name service response is analogous because it is a message that causes the VPN to be created. Therefore, step (3) of claim 1 is satisfied by sending of the C-HTTP name service response message to the client-side proxy in response to determining that the DNS request is requesting access to a secure target web site.

Additionally, step (3) of claim 1 is satisfied by actions taken by the client-side proxy to automatically initiate the VPN. In response to receiving a C-HTTP name service response (which the client-side proxy uses to determine that the DNS request is requesting access to a secure target web site), the client-side proxy "sends a request for connection to the server-side proxy, which is encrypted using

31

the server-side proxy's public key and contains the client-side proxy's IP address, hostname, request Nonce value and symmetric data exchange key for request encryption." (Ex.1002 at 65, section 2.3(3)). This connection request sent by the client-side proxy also meets step (3) of claim 1.

### Ground 2. Claim 3 is Anticipated by Kiuchi

As set forth in Ex.1009 ¶ 40 and Appendix C, Kiuchi also discloses all of the limitations of claim 3. In response to determining that the requested server-side proxy is not registered in the closed network (which indicates that the DNS request is not requesting access to a secure target web site), the C-HTTP name server returns to the client-side proxy "a status code which indicates an error." (Ex.1002 at 65, sec. 2.3(2)). In turn, "[i]f the client-side proxy receives an error status, then it performs DNS lookup, behaving like an ordinary HTTP/1.0 proxy." (Ex.1002 at 65, sec. 2.3(2)). It is well-known that such a DNS lookup involves sending a request to a DNS server and receiving an IP address back from the DNS server. (Ex.1010 at 70 et seq.). In this way, the domain name is resolved and the IP address is returned to the client-side proxy, specifically by the client-side proxy sending a lookup request to the conventional DNS server which resolves the domain name and returns the IP address to the client-side proxy. Thus, Kiuchi teaches the limitations of claim 3.

### Ground 3. Claim 7 is Anticipated by Kiuchi

As set forth in Ex.1009 ¶¶ 41-43 and Appendix C, Kiuchi also discloses all of the limitations of claim 7 in at least the following two ways:

Gatekeeper Computer Functions Implemented in C-HTTP Name Server

The '135 Patent makes clear that the gatekeeper can be implemented as a function within the DNS server (see Ex.1001 at 38:53-55). As discussed under Ground 1, the C-HTTP name server is a DNS server that performs the step of "automatically initiating the VPN" by sending the C-HTTP name service response to the client-side proxy. In this context, the C-HTTP name server also performs the functions of a gatekeeper computer because it allocates VPN resources, e.g., it generates and provides the request and response Nonce values and returns the public key of the server-side proxy and the request and response Nonce values to the client-side proxy. (Ex.1002 at 65, sec. 2.2).

Gatekeeper Computer Functions Implemented in Server-Side Proxy

Additionally, as discussed under Ground 1, Kiuchi's client-side proxy performs the step of "automatically initiating the VPN" by sending a request for connection to the server-side proxy. In this context, the server-side proxy also performs the functions of a gatekeeper computer because it allocates VPN resources such as a Connection ID and a second symmetric data exchange key that are used in establishing a secure connection between the client-side proxy and the server-side proxy. (see Ex.1002 at 66, sec. 2.3(5)). Under the broadest reasonable

33

interpretation, the gatekeeper computer can be a function in the target computer. Furthermore, similar to the gatekeeper in the '135 Patent, the server-side proxy receives a request for a VPN to be created (i.e., the request for connection from the client-side proxy) and effectively controls the creation of the VPN. Specifically, in the '135 Patent, the gatekeeper may receive a request from the DNS proxy requesting that a VPN be created. (Ex.1001 at 38:30-33). Similarly, Kiuchi's server-side proxy receives a request for connection from the client-side proxy. (Ex.1002 at 65, sec. 2.3(4)). In order to create the VPN, the server-side proxy (i.e., the gatekeeper) has to accept the request for connection from the client-side proxy, authenticate the client-side proxy, check the integrity of the Nonce values, and generate a connection ID and other parameters for the VPN (Ex.1002 at 65(4)-66(5)). The generation of the connection ID and second symmetric data exchange key by the server-side proxy is a further example of a gatekeeper computer function implemented in the server-side proxy.

### Ground 4. Claim 8 Would Have Been Obvious in view of Kiuchi

As discussed in Ground 1, the C-HTTP name server performs the step of "determining." As set forth in Ex.1009 ¶¶ 44-47 and Appendix C, it would have been apparent to a person of ordinary skill in the art as a mere design choice to consolidate domain name resolution functions in Kiuchi's C-HTTP name server. Kiuchi clearly recognizes and discloses that a conventional DNS lookup for the

domain name is needed when access is not being requested to a secure target web site, i.e., when the requested server-side proxy is not registered in the closed network. (Ex.1002 at 65, sec. 2.3(2)). This is identical to the '135 Patent, where a DNS lookup is performed when access is not being requested to a secure target web site. (ex.1001 at 38:43-47).

Kiuchi defines three new components for the system, namely the client-side proxy, the server-side proxy, and the C-HTTP name server. (Ex.1002 at 64, sec. 2.1). While Kiuchi describes a system in which a conventional DNS lookup request is made from the client-side proxy, it would have been apparent to a person of ordinary skill in the art based on Kiuchi's teachings to make the conventional DNS lookup request from the C-HTTP name server. As discussed in Ground 1, the C-HTTP name server already determines whether the DNS request received from the client-side proxy is requesting access to a secure target web site. Rather than returning an error status to the client-side proxy when the DNS request is not requesting access to a secure target web site, it would have been trivial and obvious as a mere design choice for the C-HTTP name server to pass the domain name received in the C-HTTP name service request to the conventional DNS server, as depicted in the following Figure:



**Figure 3 – Alternate Functional Diagram of Kiuchi**

Such a configuration, which places a DNS proxy server function in a modified C-HTTP name server (similar to placement of the DNS proxy server function of the '135 patent in the DNS server – see Ex.1001 at FIG. 26), is merely a rearrangement of existing functions within the C-HTTP system and could be implemented with or without modifying Kiuchi's protocols. For example, a C-HTTP name service response message containing an IP address without a public key and Nonce values (e.g., using values of zero or other convention for the public key and Nonce fields, or modifying the protocol to use a previously unused flag in the response to indicate that a public key and Nonce values are not provided)

would indicate to the client-side proxy that the DNS request is not requesting access to a secure target web site and hence that no VPN is needed. The motivation for modifying Kiuchi in this way would have been to streamline the operation of the system, e.g., instead of having the C-HTTP name server send an error status to the client-proxy which would in turn initiate a conventional DNS inquiry, the modification eliminates the error status message from the process by having the C-HTTP name server directly initiate the request to the conventional DNS server. Thus, the combination of claim 8 is obvious in view of Kiuchi. See *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 401; 127 S.Ct. 1727, 173 (2007) ("a combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results"); *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282, 96 S.Ct. 1532 (1976) (when a patent "simply arranges old elements with each performing the same function it had been known to perform" and yields no more than one would expect from such an arrangement, the combination is obvious).

### C. Request 2 – Claims 1, 3, 7 and 8 are Anticipated by Kiuchi

A careful consideration of the inner workings of the client-side proxy reveals that Kiuchi's client-side proxy performs a "resolver" function that receives a domain name resolution request from an internal client (in this case, the domain name extracted from the received HTTP request) and returns an IP address for the

37

domain name. (Ex.1009 ¶ 49). Petitioner presents the following Figure 4 to

schematically show the resolver and client functions in the client-side proxy:



**Figure 4 - Implementation of Kiuchi**

As discussed above with reference to construction of "Domain Name

Service (DNS) request," resolver functions were known in the art well before the

'135 Patent was filed. (Ex.1009 ¶ 50). Thus, in Kiuchi, an internal resolution

request (which is a "DNS request" because it is a communication that contains a

domain name and requests an IP address for the domain name) is made to the

resolver function (which is a collection of software functions within the client-side

proxy), which acts as a DNS proxy server to contact the C-HTTP name server and

optionally also the conventional DNS server to obtain an IP address for the domain name and return the IP address to the internal client. (Ex.1009 ¶ 51).

Furthermore, a careful consideration of the inner workings of the client-side proxy also reveals that the resolver function performs functions that map directly to the functions performed by the DNS proxy server of the '135 Patent. Ex.1009 ¶ 52). The DNS proxy server of the '135 Patent receives a DNS request, determines whether access to a secure web site has been requested (e.g., based on a domain name extension or by reference to an internal table of such sites), automatically initiates a VPN if access to a secure target web site has been requested, and passes through the DNS request to a conventional DNS server if access to a non-secure site had been requested (see Ex.1001 at 38:23-47). Similarly, the resolver function of Kiuchi receives a DNS request, determines whether access to a secure web site has been requested (based on a query to the C-HTTP name server, which essentially is just a remote table lookup similar to the internal table lookup of the '135 Patent), automatically initiates a VPN if access to a secure target web site has been requested, and passes through the DNS request to a conventional DNS server if access to a non-secure site had been requested.

Thus, Kiuchi's resolver function is a DNS proxy server because it is a computer or program that responds to a domain name inquiry in place of a DNS. Consequently, Kiuchi's client-side proxy effectively includes a Client Module and

a DNS Proxy Server Module, as shown in Figure 4. For purposes of the following analysis, the Client Module of the client-side proxy is the "client computer," the server-side proxy is the "target computer," and the DNS Proxy Server Module is a DNS Proxy Server in the client-side proxy. In response to receiving an HTTP request from the user agent, the Client Module sends the domain name from the URL (i.e., a "DNS request") to the DNS Proxy Server Module. This domain name will be the hostname of the server-side proxy, if the HTTP request is directed to a secure target web site on the origin server. The DNS Proxy Server Module sends a request to the C-HTTP name server and performs the "determining" and "automatically initiating" steps based on the type of response received from the C-HTTP name server (which depends on whether the DNS request is requesting access to a secure target web site in the C-HTTP closed network). A VPN is automatically initiated between the client-side proxy and the server-side proxy if the DNS request is requesting access to a secure target web site.

### Ground 5. Claim 1 is Anticipated by Kiuchi

As set forth in Ex.1009 ¶¶ 53-58 and Appendix D, Kiuchi discloses all of the limitations of claim 1.

Step (1) of Claim 1 (Ex.1009 ¶ 53) - When the Client Module (i.e., the "client computer") receives the HTTP request from the user agent, it extracts the hostname (i.e., domain name) from the URL received in the HTTP request and

sends an internal resolver request containing the domain name to the DNS Proxy Server Module. This internal resolver request is a "DNS request" because it is a communication that contains a domain name (i.e., the hostname from the URL in the HTTP request) and requests an IP address for the domain name. Because the domain name sent in the DNS request is the hostname given to the server-side proxy, the domain name is literally "associated with the target computer" as required by the claim. Therefore, the DNS request "requests an IP address corresponding to a domain name associated with the target computer" as required by step (1). The Client Module is a "client computer" because it is a program from which the DNS request is generated and transmitted.

Step (2) of Claim 1 (Ex.1009 ¶¶ 54-56) - Upon receiving the DNS request from the Client Module, the DNS Proxy Server Module sends the domain name to the C-HTTP name server in the form of a C-HTTP name service request to ask the C-HTTP name server whether the client-side proxy can communicate with the specified host. (Ex.1002 at 65, sec. 2.3(2)). The C-HTTP name server "examines whether the requested server-side proxy is registered in the closed network." (Ex.1002 at 65, sec. 2.3(2)). The C-HTTP name server determines whether the DNS request transmitted by the Client Module in step (1) is requesting access to a secure web site based on whether the requested server-side proxy is registered in the closed network. The C-HTTP name server determines that access is being

41

requested to a secure web site being proxied by the server-side proxy (i.e., that access is being requested to a "secure web site"/"secure target web site") and sends a C-HTTP name service response to the DNS Proxy Server Module containing "the IP address and public key of the server-side proxy and both request and response Nonce values" (Ex.1002 at 65, sec. 2.3(2)), if the requested server-side proxy is registered in the closed network. The C-HTTP name server determines that access is not being requested to a secure web site and sends "a status code which indicates an error," if the requested server-side proxy is not registered in the closed network. (Ex.1002 at 65, sec. 2.3(2)-(3)). Thus, step (2) of claim 1 is satisfied by the determination made by the C-HTTP name server.

Additionally, step (2) of claim 1 is satisfied by a determination made by the DNS Proxy Server Module based on the type of response received from the C-HTTP name server. In particular, the DNS Proxy Server Module determines that access is being requested to a secure web site being proxied by the server-side proxy (i.e., that access is being requested to a "secure target web site"), only if a C-HTTP name service response is returned, and determines that access is not being requested to a secure web site, if the response is an error status.

Step (3) of Claim 1 (Ex.1009 ¶¶ 57-58) - If the DNS Proxy Server Module receives a C-HTTP name service response from the C-HTTP name server and therefore determines that access is being requested to a secure target web site, the

42

DNS Proxy Server Module and/or the Client Module automatically initiates the VPN, specifically by the DNS Proxy Server Module sending the IP address and VPN resources (e.g., the public key and Nonce values) to the Client Module and the Client Module "[sending] a request for connection to the server-side proxy, which is encrypted using the server-side proxy's public key and contains the client-side proxy's IP address, hostname, request Nonce value and symmetric data exchange key for request encryption." (Ex.1002 at 65, right column, section 2.3(3)). In this regard, it should be noted that the '135 Patent provides, as one example of automatically initiating the VPN, transmission of a message requesting that a VPN be created (see Ex.1001 at 38:30-33). Sending the IP address and VPN resources by the DNS Proxy Server Module to the Client Module is analogous because it is a message that causes the VPN to be created. Therefore, step (3) of claim 1 is satisfied by the DNS Proxy Server Module.

Additionally or alternatively, step (3) of claim 1 is satisfied by actions taken by the Client Module to automatically initiate the VPN. In response to receiving the IP address, public key, and Nonce values, the Client Module "sends a request for connection to the server-side proxy, which is encrypted using the server-side proxy's public key and contains the client-side proxy's IP address, hostname, request Nonce value and symmetric data exchange key for request encryption."

(Ex.1002 at 65, section 2.3(3)). This connection request sent by the Client Module also meets step (3) of claim 1.

### Ground 6. Claim 3 is Anticipated by Kiuchi

As set forth in Ex.1009 ¶ 59 and Appendix D, Kiuchi also discloses all of the limitations of claim 3. In response to determining that the DNS request in step (2) is not requesting access to a secure target web site (i.e., in response to receiving the status code which indicates an error), the DNS Proxy Server Module performs a DNS lookup as "an ordinary HTTP/1.0 proxy" (Ex.1002 at 65, section 2.3(2)) and returns an IP address to the Client Module. It is well-known that such a DNS lookup involves sending a request to a DNS server and receiving an IP address back from the DNS server. (Ex.1010 at 70 et seq.). In this way, the domain name is resolved and the IP address is returned to the client computer (i.e., Client Module), specifically by the DNS Proxy Server Module performing the DNS lookup (through a request to a conventional DNS) and returning the IP address to the Client Module. Thus, Kiuchi teaches the limitations of claim 3.

### Ground 7. Claim 7 is Anticipated by Kiuchi

As set forth in Ex.1009 ¶ 60 and Appendix D, Kiuchi also discloses all of the limitations of claim 7. As discussed in Ground 5, Kiuchi's DNS Proxy Server Module and/or Client Module performs the step of "automatically initiating the VPN" by sending a request for connection to the server-side proxy. In this context,

44

the server-side proxy also performs the functions of a gatekeeper computer because it allocates VPN resources, such as a Connection ID and a second symmetric data exchange key, that are used in establishing a secure connection between the client-side proxy and the server-side proxy. (Ex.1002 at 66, section 2.3(5)). Under the broadest reasonable interpretation, the gatekeeper computer can be a function in the target computer.

Furthermore, similar to the gatekeeper in the '135 Patent, the server-side proxy receives a request for a VPN to be created and effectively controls the creation of the VPN. Specifically, in the '135 Patent, the gatekeeper may receive a request from the DNS proxy requesting that a VPN be created. (Ex.1001 at 38:30-33). Similarly, Kiuchi's server-side proxy receives a request for connection from the client-side proxy. (Ex.1002 at 65, sec. 2.3(4)). In order to create the VPN, the server-side proxy (i.e., the gatekeeper) has to accept the request for connection from the client-side proxy, authenticate the client-side proxy, check the integrity of the Nonce values, and generate a connection ID and other parameters for the VPN (Ex.1002 at 65(4)-66(5)). The generation of the connection ID and second symmetric data exchange key by the server-side proxy is a further example of the gatekeeper computer function implemented in the server-side proxy.

**Ground 8. Claim 8 is Anticipated by Kiuchi**

As set forth in Ex.1009 ¶ 59 and Appendix D, Kiuchi also discloses all of the limitations of claim 8. As discussed in Ground 5, the DNS Proxy Server Module determines whether the DNS request transmitted by the Client Module in step (1) is requesting access to a secure web site based on whether the C-HTTP name server returns the IP address and VPN resources (i.e., the public key of the server-side proxy and both request and response Nonce values) or returns a status code which indicates an error. Thus, step (2) is performed in a DNS proxy server as required by claim 8.

Also, Kiuchi teaches that "If a client-side proxy receives an error status, then it performs DNS lookup, behaving like an ordinary HTTP/1.0 proxy." (Ex.1002 at 65, section 2.3, paragraph 2). Specifically, the DNS Proxy Server Module performs a DNS lookup in response to receiving the error status and hence performs a DNS lookup in response to determining that the DNS request is not requesting access to a secure target web site. A person of ordinary skill would have understood that Kiuchi's reference to performing a "DNS lookup ... like an ordinary HTTP/1.0 proxy" involves resolving a domain name into an IP address and returning the IP address to the client computer that requested it, specifically by forwarding the DNS request to the conventional DNS server, receiving an IP address from the DNS server, and returning the IP address to the Client Module. For example, RFC 1123 (Ex.1010) defines how computers on the Internet should

operate and states that when using domain names, *"Host domain names MUST be translated to IP addresses* as described in Section 6.1." (Ex.1010 at 13 (emphasis added).) Section 6.1, in turn, states that *"Every host MUST implement a resolver for the Domain Name System* (DNS), and it MUST implement a mechanism using this DNS resolver to convert host names to IP addresses and vice-versa." *(Id.* at 72.). Thus, in response to determining that the DNS request in step (2) is not requesting access to a secure target web site, the DNS Proxy Server Module passes the domain name generated by the Client Module to the conventional DNS server and hence passes through the request to the conventional DNS server in order to perform the DNS lookup. Thus, Kiuchi teaches all the limitations of claim 8.

### D.   Request 3 – Claims 1, 3, 7 and 8 are Unpatentable over Dalton in view of Kiuchi

Dalton was published in the Proceedings of JENC8, May 1997 and was republished in Computer Networks and ISDN Systems, Vol. 29, No. 15, November 1, 1997 (pp. 1799-1808). (Exs.1003 and 1024). Thus, Dalton (like Kiuchi, discussed above) is prior art under 35 U.S.C. §102(b).

Prior to October 1998, use of the Internet was expanding exponentially. Organizations with multiple locations were moving away from costly private circuits for local communication to closed virtual private networks implemented on the Internet. (Ex.1009 ¶ 62). Kiuchi is just one of many references describing how to implement a closed network on the Internet. The '135 patent concedes that in

the prior art, a "tremendous variety of methods have been proposed and implemented to provide security and anonymity for communications over the Internet." (Ex. 1001, 1:15-17). The cost incentive to set up secure connections over the Internet instead of resorting to private leased circuits was a major factor in the shift to reliance on the Internet. (Ex.1009 ¶ 62).

As discussed above, Kiuchi addressed the hospital space, recognizing that its technology was equally applicable for use by other institutions. Kiuchi explicitly explained the incentive to privately communicate over the Internet:

> The Internet is expected to become available to almost all major hospitals. Although a closed network can be constructed using a privately-leased circuit, additional investment for its construction is necessary. If a closed network can be constructed on the Internet, it would be *convenient, speedy and reasonable in terms of cost*. In addition, if a closed network is realized by privately leased circuits, it is not always easy to operate several closed networks flexibly and simultaneously.

(Ex.1002 at 69, sec. 4.5, emphasis added)

Kiuchi disclosed "a closed HTTP-based virtual network [that] can be constructed for closed groups; for example, the headquarters and branches of a given corporation." (Ex. 1002, p. 69, sec. 5). Kiuchi re-emphasized the cost incentive for moving to the Internet: "if resources which might otherwise be invested in private circuits are channeled into the Internet, it will contribute to its further development." *Id.*

Meanwhile, Dalton described a firewalled Domain Name System in a single machine, referred to as a Compartmented Mode Workstation (CMW), that provides a DNS service such that clients on an internal (closed) network can have access to both public and private hosts on the internal network as well as access to hosts on an external network, while hosts on the external network can have access to only public hosts on the internal network. (Ex.1009 ¶ 63). Dalton illustrates a simple example of the CMW-based system having two zones (i.e., internal/protected and external/public) as follows (Ex.1003 at 711-4, Figure 2):



As set forth in Ex.1009 ¶¶ 64-65, the CMW intercepts and processes DNS requests from external clients on the public Internet and internal clients on the closed, private Local Area Network (LAN). External clients are only permitted to access specific servers on the LAN. However, internal clients are permitted to access all servers on the LAN as well as servers on the Internet. When the CMW receives a DNS request from an internal client on the LAN, it determines whether

49

the DNS request is requesting access to an internal host on the LAN based on a set of DNS records maintained in the CMW. If the DNS request is requesting access to an internal host on the LAN, then the CMW can resolve the IP address locally, as represented by the arrow looping back to the LAN in the above figure. However, if the DNS request is requesting access to an external host on the Internet, then the CMW forwards the DNS request to a DNS server on the Internet, as represented by the arrow from the name service daemon in the "INSIDE" box to the "OUTSIDE" box in the above figure. Dalton makes clear that an internal host can be a World Wide Web (web) server (Ex.1003 at 711-3) and that a client can include a browser (Ex.1003 at 711-6). Thus, Dalton teaches secure access to web sites by an internal client to an internal host.

The CMW includes a front end daemon that intercepts a DNS request from an internal client and forwards the DNS request to a name service daemon that includes a full set of DNS data for the internal LAN (referred to as the "SYSTEM INSIDE" level) and is responsible for resolving the DNS request. (Ex.1009 ¶ 66-67). If the name service daemon has a DNS record for the DNS request (indicating that the requested host is on the inside network), then the name service daemon can resolve the IP address locally and pass the IP address back to the internal querying client via the front end daemon. (Ex.1009 ¶ 68). However, when the internal DNS client sends a DNS request for an external host such that the name service daemon

needs to query a non-local name server on the Internet in order to resolve the client query, it sends the DNS request to the external DNS server on the Internet. (Ex.1009 ¶ 69). Thus, it should be noted that Dalton's CMW is both a DNS server, because it provides a lookup service that returns an IP address for a requested domain name, and a DNS proxy server, because it responds to a domain name inquiry in place of a DNS (e.g., in place of an external DNS server).

The LAN of Dalton would have been a costly solution for institutions with several geographically separate facilities at the time. As Kiuchi explained, the convenience, speed and costs associated with a private network implementation on the Internet were a great incentive for institutions. (see Ex.1002 at 69, ¶¶ 4.5, 5). Thus, those of ordinary skill in the art would have been clearly motivated to replace Dalton's closed, private LAN with a closed virtual private network that automatically and transparently creates a secure/encrypted channel (i.e., a VPN) between an "internal" client computer and an "internal" target computer, which maintains secure communications between the two, possibly geographically separate, computers as if the two computers were still operating on the closed, private LAN.

For purposes of the following analysis, an internal querying client is the "client computer," and an internal web server on the LAN the "target computer."

**Ground 9. Claim 1 Would Have Been Obvious over Dalton/Kiuchi**

51

As set forth in Ex.1009 ¶¶ 62-68 and Appendix E, the obvious combination of Dalton and Kiuchi discloses all limitations of claim 1.

Step (1) of Claim 1 - As discussed above, an internal querying client (i.e., the "client computer") sends a DNS query to the CMW requesting the IP address of an internal web server on the LAN (i.e., the "target computer"). (Ex.1009 ¶¶ 65-66). Dalton makes clear that the Domain Name System (DNS) used in the CMW-based DNS service is the conventional DNS defined by the IETF that returns an IP address for a domain name. (Ex.1009 ¶ 63). As such, the DNS query generated and transmitted from the internal querying client is a "DNS request that requests an IP address for a domain name associated with the target computer," the internal querying client is a "client computer," and an internal web server on the LAN is the "target computer." Thus, step (1) of claim 1 is satisfied by the generation of the DNS query from the internal client.

Step (2) of Claim 1 - As discussed above, Dalton's CMW receives the DNS request from the internal client (i.e., the client computer) and forwards the DNS request to the name service daemon running at the SYSTEM INSIDE level. The CMW determines whether the DNS request from the internal client is requesting access to a server on the internal network based on the DNS data held by the name service daemon. (see Ex.1003 at 711-3 to 711-4). Dalton makes clear that a host on the LAN can be a World Wide Web server – see Ex.1003 at 711-3 – and

therefore such a host is a target computer having a "secure (target) web site." It is secured by the CMW, which limits access to only authorized clients. Thus, the CMW determines whether the DNS request is requesting access to a secure (target) web site based on whether there is a DNS record for the domain name at the SYSTEM INSIDE level. If the target computer is an internal World Wide Web server, then the DNS request is requesting access to a secure (target) web site. Step (2) is satisfied by this determination made by the CMW.

Step (3) of Claim 1 - If the DNS request in step (2) is requesting access to a secure target web site, then, as discussed above, the CMW resolves the IP address for the domain name locally, specifically using the set of DNS data maintained by the name service daemon running at the SYSTEM INSIDE level. Thus, Dalton teaches that action is taken "in response to determining that the DNS request in step (2) is requesting access to a secure target web site."

Dalton does not teach "automatically initiating the VPN" as required by the claim. However, it was well-known for a DNS server or DNS proxy server to return VPN resources along with an IP address in response to a DNS request that is requesting access to a secure target web site and for a VPN to be automatically initiated based on those VPN resources. (Ex.1009 ¶ 70). For example, Kiuchi teaches a DNS server (i.e., the C-HTTP name server) that receives a DNS request and, in response to determining that the DNS request is requesting access to a

secure target web site (i.e., that the DNS request is requesting access to a web page at the origin server being proxied by the target computer), returns an IP address along with VPN resources (e.g., a public key and Nonce values) used for automatically initiating a VPN between a client computer and a target computer. (Ex.1009 ¶ 70). The client computer (i.e., client-side proxy) in turn sends a request for a secure connection to the target computer (i.e., the server-side proxy) using the IP address, the public key, and the Nonce values. (Ex.1009 ¶ 70). Thus, in Kiuchi, the VPN is automatically initiated in response to a determination that the DNS request is requesting access to a secure target web site.

As discussed above, it would have been obvious to replace Dalton's private, closed LAN with a closed virtual network of the type taught by Kiuchi so that a VPN is automatically initiated between an "internal" client computer and an "internal" target computer (i.e., a "secure target web site") in order to maintain secure communications between the two computers as if the two computers were still operating on the closed, private network. (Ex.1009 ¶ 71). Replacing Dalton's private, closed LAN with a closed virtual network of the type taught by Kiuchi would involve merely modifying Dalton's CMW to perform Kiuchi's name server functions (i.e., to return an IP address along with VPN resources if the DNS request from the "internal" client computer is requesting access to an "internal" target computer) and connecting the internal hosts to the Internet using the CMW

as their DNS (proxy) server. (Ex.1009 ¶ 72). It would have been obvious to modify Dalton's CMW in this way because Dalton's CMW and Kiuchi's C-HTTP name server are both DNS servers that perform a lookup service and return an IP address for a requested domain name; thus, it would have been obvious to include functionality from one device in the other. (Ex.1009 ¶ 72). Modification of Dalton also would involve adding VPN establishment functions performed by Kiuchi's client-side proxy and server-side proxy (e.g., implemented respectively in the client and target computers, or implemented respectively in firewall devices protecting the client and target computers as in Kiuchi) to automatically initiate a VPN based on the VPN resources returned by the modified CMW. (Ex.1009 ¶ 72). Such a modified CMW also would handle requests from the server-side VPN establishment function to authenticate the client computer as in Kiuchi (Ex.1009 ¶ 72). In other words, the "internal" computers would be connected over the Internet by VPNs created in accordance with the closed network set up by Kiuchi. As mentioned above, there are many advantages to replacing a private, closed network of the type used in Dalton (i.e., the Local Area Network) with a closed virtual network constructed on the Internet, e.g., convenience, speed, and cost (see Ex.1002 at 69), thus providing the motivation for modifying Dalton's CMW to include Kiuchi's VPN establishment functions.

A modified CMW implementing Kiuchi's name server functions performs "automatically initiating the VPN" by returning VPN resources along with an IP address in response to the DNS request, which effectively initiates establishment of the VPN, as discussed in Kiuchi. The '135 Patent provides, as one example of automatically initiating the VPN, transmission of a message requesting that a VPN be created (see Ex.1001 at 38:30-33). Returning VPN resources by the CMW to the client-side VPN establishment function is analogous because it is a message that causes the VPN to be created without user involvement. Therefore, step (3) of claim 1 is satisfied by returning the VPN resources by the modified CMW to the client-side VPN establishment function.

Additionally or alternatively, step (3) of claim 1 is satisfied by actions taken by the client-side VPN establishment function (e.g., implemented in a modified client computer, or implemented in a firewall protecting the client computer), which performs "automatically initiating the VPN" by sending a request for connection to the target computer in response to receiving the IP address and VPN resources from the modified CMW. This connection request sent by the client-side VPN establishment function also meets step (3) of claim 1.

Thus, the use of a closed network on the Internet as taught by Kiuchi in place of the LAN in Dalton discloses all elements of claim 1.

**Ground 10. Claim 3 Would Have Been Obvious over Dalton/Kiuchi**

As discussed above and set forth in Ex.1009 Appendix E, Dalton teaches that if the DNS request received by the CMW from the internal client is requesting access to an external host on the Internet, the CMW sends the DNS request to a DNS server on the Internet (represented by the arrow in above figure from the name service daemon in the "INSIDE" box to the "OUTSIDE" box) and the IP address is passed back to the originating client via the front end daemon. (Ex.1009 ¶ 69). Thus, Dalton's CMW includes resolving the IP address for the domain name and returning the IP address to the client computer in response to determining that the DNS request in step (2) is not requesting access to a secure target web site, as recited in claim 3.

### Ground 11. Claim 7 Would Have Been Obvious over Dalton/Kiuchi

As set forth in Ex.1009 Appendix E and discussed above in Ground 9, it would have been obvious and quite routine to modify Dalton's CMW to return an IP address along with VPN resources such as a public key and Nonce values if the DNS request is requesting access to a secure web site on the "internal" network. In this context, the modified CMW is also a gatekeeper computer because it allocates VPN resources (e.g., request and response Nonce values) used for communicating between the client computer and the target computer. The '135 Patent makes clear that the gatekeeper can be implemented within a DNS server such as the CMW (Ex.1001 at 38:53-55).

Additionally or alternatively, the server-side VPN establishment function (e.g., implemented in the target computer, or implemented in a firewall protecting the target computer) is a gatekeeper computer because it allocates VPN resources such as a Connection ID and a second symmetric data exchange key that are used in establishing a secure connection between the client computer and the target computer. (Ex.1002 at 66, sec. 2.3(5)). Under the broadest reasonable interpretation, the gatekeeper computer can be a function in the target computer.

Thus, in at least two ways, the combination of Dalton and Kiuchi teaches that step (3) comprises the step of using a gatekeeper computer that allocates VPN resources for communicating between the client computer and the target computer, as required by claim 7.

### Ground 12. Claim 8 Would Have Been Obvious over Dalton/Kiuchi

As discussed above and set forth in Ex.1009 Appendix E, the CMW receives DNS requests and responds to DNS requests in place of one or more DNS servers (e.g., the DNS server on the Internet) and therefore the CMW is or includes a DNS proxy server. Furthermore, as discussed above with reference to claim 1, the CMW performs the "determining" of step (2). Additionally, as discussed above, if the DNS request received by the CMW from the internal client is requesting access to a host on the Internet, the CMW sends the DNS request to a DNS server on the Internet (represented by the arrow in above figure from the name service daemon

in the "INSIDE" box to the "OUTSIDE" box) and the IP address is passed back to the originating client via the front end daemon. (Ex.1009 ¶ 69). The CMW therefore passes through the request to a DNS server by sending the packet containing the domain name out over the network to the DNS server on the Internet. Thus, Dalton's CMW is or includes a DNS proxy server that performs the "determining" of step (2) and passes through the request to a DNS server if it is determined in step (3) that access is not being requested to a secure target web site, as required by claim 8.

## VI.  CONCLUSION

Because the information presented in this petition shows that there is a reasonable likelihood that the Petitioner would prevail with respect to at least one of the claims challenged in the petition, the Petitioner respectfully requests that a Trial be instituted and that claims 1, 3, 7 and 8 be canceled as unpatentable.

Dated: June 23, 2013        Respectfully submitted,


/Robert M. Asher, #30445/
Robert M. Asher, Reg. No. 30,445
Jeffrey T. Klayman, Reg. No. 39,250
Sunstein Kann Murphy & Timbers LLP
125 Summer Street, 11th Floor
Boston, MA 02110-1618
(617) 443-9292
Attorneys for Petitioner, New Bay Capital, LLC.

03959/05001 1894953.1

## CERTIFICATE OF SERVICE

The undersigned certifies service pursuant to 37 C.F.R. §§42.6(e) and

42.105(b) on the Patent Owner by overnight delivery by Airport Courier Service of

East Boston, MA of a copy of this Petition for Inter Partes Review and supporting

materials in its entirety at the correspondence address of record for the '135 patent:

Finnegan, Henderson, Farabow, Garrett & Dunner LLP
901 New York Avenue, NW
Washington, DC 20001-4413


Date: June 23, 2013                     _____ /Robert M. Asher/ _____
                                        Robert M. Asher, Reg. No. 30,445