Exhibit 6

UNITED STATES PATENT AND TRADEMARK OFFICE

—————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————————

New Bay Capital, LLC,

Petitioner,

v.

VirnetX Inc.

Patent Owner.

—————————

IPR2013-00378

Patent 7,921,211
Issue Date: April 5, 2011
Title: AGILE NETWORK PROTOCOL FOR SECURE COMMUNICATIONS
USING SECURE DOMAIN NAMES

—————————

**PETITION FOR *INTER PARTES* REVIEW
OF U.S. PATENT NO. 7,921,211**

Mail Stop PATENT BOARD
Patent Trial and Appeal Board
United States Patent and Trademark Office
PO Box 1450
Alexandria, Virginia 22313–1450

# TABLE OF CONTENTS

I. COMPLIANCE WITH FORMAL REQUIREMENTS ....................................... 1

   A. REAL PARTIES-IN-INTEREST ................................................ 1

   B. STANDING ........................................................................... 1

   C. RELATED MATTERS ............................................................ 1

   D. NOTICE OF LEAD AND BACKUP COUNSEL ...................... 6

   E. SERVICE INFORMATION .................................................... 6

   F. PROOF OF SERVICE ON THE PATENT OWNER ................ 6

   G. FEE ...................................................................................... 7

II. STATEMENT OF PRECISE RELIEF REQUESTED ..................... 7

III. FACTUAL BACKGROUND ............................................................ 7

   A. The Claims Of The '211 Patent Purport To Improve Over Prior Art Domain Name Service Systems By Programming Such Systems To Include Code for "Indicating in Response to the Query Whether The Domain Name Service System Supports Establishing A Secure Communication Link" ........................... 7

      1. Admitted Prior Art ....................................................... 8

      2. The Purported Improvement over Prior Art Domain Name Service Systems: Code for "Indicating in Response to the Query Whether the Domain Name Service System Supports Establishing a Secure Communication Link" ............ 9

   B. The '211 Patent Does Not Define "Indicating in Response to the Query Whether The Domain Name Service System Supports Establishing A Secure Communication Link" But Discloses Embodiments That Perform Such "Indicating" ................................................................ 10

IV. CLAIM CONSTRUCTION .......................................................... 12

   A. Legal Standards ................................................................. 12

   B. Domain name ................................................................... 15

   C. Top-level domain name ..................................................... 18

   D. Domain name service system ........................................... 19

   E. Secure communication link. ............................................. 21

   F. Code for ...indicating ....................................................... 21

   G. Transparently ................................................................... 25

V.    FULL STATEMENT OF THE REASONS FOR CANCELLATION OF CLAIMS IN THE '211 PATENT ............................................................. 25

   A.  Kiuchi is Prior Art That Uses a Domain Name Service in Establishing Secure Communication Links Over the Internet ................................................. 25

   B.  Claim 36 is Anticipated by Kiuchi ............................................... 29

   C.  Claim 37 is Anticipated by Kiuchi ............................................... 41

   D.  Claim 47 is Anticipated by Kiuchi ............................................... 43

   E.  Claim 51 is Anticipated by Kiuchi ............................................... 45

VI.   CONCLUSION ...................................................................................... 48

# TABLE OF AUTHORITIES

**Cases**

*AirCraft Medical LTD. v. Verathon Inc.*, Reexam. Control No. 95/000,161, Appeal 2012-007851, p. 16 (PTAB Dec. 11, 2012) .......................................................... 15

*Data General Corp. v. Johnson,* 78 F.3d 1556, 1565 (Fed.Cir.1996) .................... 14

*Garmin Int'l Inc. v.Cuozzo Speed Technologies, Inc.,* IPR2012-00001, Paper 15 (PTAB, Jan. 9, 2013) ........................................................................................ 13

*In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1365 (Fed. Cir. 2004) ............. 13

*In re Morris*, 127 F.3d 1048, 1056 (Fed. Cir. 1997) ............................................... 15

*Key Pharmaceuticals v. Hercon Laboratories Corp.*, 161 F.3d 709, 715, 48 USPQ2d 1911, 1916 (Fed. Cir. 1998) ................................................................. 14

*Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir.1998) ........................................................................................................................... 13

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005)(en banc)............... 13

*RenishawPLC v. Marposs Societa per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998) .................................................................................................................... 13

*VirnetX Inc. and Science Applications International Corporation v. Apple Inc.*, Case No. 6:12cv855 (E.D. Tex.) ......................................................................... 1

*VirnetX Inc. v. Apple Inc.*, Case No. 6:13cv211 (E.D. Tex.) ................................... 1

*VirnetX Inc. v. Cisco Systems, et al.*, Case No. 6:10cv417 (E.D. Tex.)........... 1, 2, 17

*VirnetX Inc. v. Mitel Networks Corp., et al.*, Case No. 6:11cv18(E.D. Tex.)........... 2

*VirnetX Inc., and Science Applications International Corporation v. Microsoft Corporation*, Case No. 6:13cv351 (E.D. Tex.) ..................................................... 2

*VirnetX v. Microsoft Corporation*, Case No. 6:07 CV 80 (E.D. Tex. 2007) .... 16, 20

*York Prods., Inc. v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568,1572 (Fed. Cir. 1996) ........................................................................................................... 13

## Statutes

35 U.S.C. §102(b)........................................................................... 7, 26

35 U.S.C. §301(a)(2), (d) ............................................................... 14

35 U.S.C. §317(b)............................................................................. 3

## Treatises

18 Susan Bandes & Lawrence B. Solum, Moore's Federal Practice §134-30, at 134-63 (3d ed.1998).................................................................. 14

## Regulations

37 C.F.R. § 42.8(b)(1) ...................................................................... 1

37 C.F.R. §42.100 (b)...................................................................... 13

37 C.F.R. §42.15(a) ........................................................................... 7

# EXHIBIT LIST

1001. U.S. Patent No. 7,921,211

1002. C-HTTP – The Development of a Secure, Closed HTTP-based Network on the Internet, Takahiro Kiuchi and Shigekoto Kaihara ("Kiuchi")

1003. U.S. Patent No. 6,560,634 ("Broadhurst")

1004. Housley Declaration

1005. VirnetX's Opening Claim Construction Brief - VirnetX Inc. v. Cisco Systems, Inc., et al.

1006. Prosecution History of U.S. Patent No. 7,418,504

1007. Prosecution History of U.S. Patent No. 7,921,211

1008. Memorandum Opinion - VirnetX, Inc. v. Microsoft Corporation

1009. VirnetX's Opening Claim Construction Brief - VirnetX, Inc. v. Mitel Networks Corp., et al.

1010. The American Heritage Dictionary, Third Edition, definition of indicate and indication

1011. VirnetX's Reply Claim Construction Brief - VirnetX Inc. v. Mitel Networks Corporation, et al.

1012. VirnetX's Reply Claim Construction Brief - VirnetX, Inc. v. Cisco Systems, Inc., et al.

1013. Memorandum Opinion and Order - VirnetX Inc. v. Cisco Systems, Inc., et al.

1014. U.S. Patent No. 6,449,657

1015. Cisco Reexamination of U.S. Patent No. 7,921,211

1016. VirnetX, Inc. v. Apple, Inc. – Transcript of Trial, Morning Session, Nov. 1, 2012

# I. COMPLIANCE WITH FORMAL REQUIREMENTS

## A. REAL PARTIES-IN-INTEREST

Petitioner New Bay Capital, LLC ("New Bay" or "Petitioner") respectfully requests inter partes review for claims 36, 37, 47 and 51 of U.S. Patent No. 7,921,211 (the "'211 patent," attached as Ex. 1001). The present assignee of the '211 patent is VirnetX, Inc. Pursuant to 37 C.F.R. § 42.8(b)(1), Petitioner certifies that the real parties-in-interests are New Bay Capital, LLC and Eastern Shore Capital, LLC. Eastern Shore Capital, LLC is New Bay's parent company.

## B. STANDING

Petitioner certifies that the '211 patent, issued on April 5, 2011, is available for inter partes review and that Petitioner is not barred or estopped from requesting an inter partes review challenging the claims of the '211 patent.

## C. RELATED MATTERS

The '211 patent has been asserted against the following companies in the following proceedings:

1. Apple, Inc. in three actions: *VirnetX Inc. v. Cisco Systems, et al.*, Case No. 6:10cv417 (E.D. Tex.) filed August 11, 2010; *VirnetX Inc. and Science Applications International Corporation v. Apple Inc.*, Case No. 6:12cv855 (E.D. Tex.), filed November 6, 2012; and *VirnetX Inc. v. Apple Inc.*, Case No. 6:13cv211 (E.D. Tex.), filed February 26, 2013. On February 28, 2013, the District Court in

Case No. 6:10cv417 entered a Final Judgment finding, *inter alia*, that Apple had infringed claims 36, 37, 47 and 51 of the '211 patent and that such claims were not invalid despite having considered the Kiuchi reference presented below.

2. Also, Cisco Systems, Inc., Aastra USA, Inc., Aastra Technologies Ltd., NEC Corporation, and NEC Corporation of America, in *VirnetX Inc. v. Cisco Systems, et al.*, Case No. 6:10cv417 (E.D. Tex.), filed August 11, 2010. On March 19, 2013, the District Court in Case No. 6:10cv417 entered a Final Judgment finding, *inter alia*, that Cisco had not infringed claims 1, 8, 23, 27, and 31 of the '211 patent and that such claims were not invalid.

3. Avaya Inc., and Mitel Networks Corporation, Mitel Networks, Inc., Siemens AG, Siemens Communications, Inc., Siemens Corporation, Siemens Enterprise Communications GmbH &Co. KG, Siemens Enterprise Communications, Inc., in *VirnetX Inc. v. Mitel Networks Corp., et al.*, Case No. 6:11cv18(E.D. Tex.), filed January 1, 2011.

4. Microsoft Corporation in *VirnetX Inc., and Science Applications International Corporation v. Microsoft Corporation*, Case No. 6:13cv351 (E.D. Tex.), filed April 22, 2013.

Additionally, the '211 patent is the subject of two pending inter partes reexaminations, 95/001,856 brought by Cisco Systems, and 95/001,789 brought by

Apple Inc. Neither of the pending reexaminations has reached the stage of a Right of Appeal Notice. In these reexaminations, the requesters are contesting all 60 claims of the patent, and have asserted more than a dozen prior art references in various combinations. The present Petition is, by contrast, highly streamlined in that it focuses on only a small subset of claims, and relies on a single prior art reference (i.e., Kiuchi) to invalidate those claims. The present Petition advances new evidence (not presented in the pending reexaminations) and explanations to justify cancellation of claims 36, 37, 47 and 51 over Kiuchi.

As a result of the cross-collateral estoppel provisions of 35 U.S.C. §317(b), the pending reexaminations will likely terminate before either reaches a final enforceable result. The District Court in Case No. 6:10cv417 has already entered Final Judgments against the requesters in the pending reexaminations, finding that each of the requesters (Cisco and Apple) failed to prove the invalidity of the '504 patent. Given that the pending reexaminations have not even reached the stage of a Right of Appeal Notice, it is highly unlikely that the reexaminations will have time to run their full course (i.e., completing proceedings at the Examiner level, the Board level, and the Federal Circuit level) before the district court decisions become "final," thereby necessitating termination of the reexaminations under 35 U.S.C. §317(b).

New Bay is also seeking inter partes review of related U.S. Patent No. 7,418,504 and requests that the two reviews be assigned to the same Board for administrative efficiency.

In addition, New Bay is seeking inter partes review of grandparent U.S. Patent No. 6,502,135 and of its divisional U.S. Patent No. 7,490,151.

The following additional pending patent applications and reexaminations are listed on PAIR as related to the '211 patent:

13/049,552 filed on 03-16-2011

13/336,958 filed on 12-23-2011

13/337,757 filed on 12-27-2011

13,339,257 filed on 12-28-2011

13/342,795 filed on 01-03-2012

13/343,465 filed on 01-04-2012

13/615,528 filed on 09-13-2012

13/615,536 filed on 09-13-2012

13/615,557 filed on 09-13-2012

13/617,375 filed on 09-14-2012

13/617,446 filed on 09-14-2012

13/903,788 filed on 05-28-2013

The following additional pending patent applications and reexaminations are listed on PAIR as related to grandparent U.S. Patent No. 6,502,135:

11/839,969 filed on 08-16-2007

11/924,460 filed on 10-25-2007

13/075,081 filed on 03-29-2011

13/080,680 filed on 04-06-2011

13/093,785 filed on 04-25-2011

13/181,041 filed on 07-12-2011

13/285,962 filed on 10-31-2011

13/474,397 filed on 05-17-2012

13/615,436 filed on 09-13-2012

13/618,966 filed on 09-14-2012

13/620,270 filed on 09-14-2012

13/620,371 filed on 09-14-2012

13/890,206 filing date not listed

95/001,679 filed on 07-08-2011

95/001,682 filed on 07-11-2011

95/001,697 filed on 07-25-2011

95/001,714 filed on 08-16-2011

95/001,746 filed on 09-07-2011

95/001,792 filed on 10-25-2011

95/001,851 filed on 12-13-2011

95/001,949 filed on 03-28-2012


## D. NOTICE OF LEAD AND BACKUP COUNSEL

Lead Counsel for the Petitioner is Robert M. Asher, Reg. No. 30,445, of
Sunstein Kann Murphy and Timbers, LLP. Back-up counsel for the Petitioner is
Jeffrey Klayman, Reg. No. 39,250, of Sunstein Kann Murphy and Timbers, LLP.


## E. SERVICE INFORMATION

New Bay may be served through its counsel, Sunstein Kann Murphy &
Timbers LLP via email to rasher@sunsteinlaw.com and
jklayman@sunsteinlaw.com or otherwise to

> Robert M. Asher
> Jeffrey Klayman
> Sunstein Kann Murphy & Timbers LLP
> 125 Summer Street
> Boston, MA 02110-1618
> 617 443 9292 (phone)
> 617 443 0004 (fax)


## F. PROOF OF SERVICE ON THE PATENT OWNER

As identified in the attached Certificate of Service, a copy of the present Petition, in its entirety, is being served to the Patent Owner's address of the attorney of record.

### G. FEE

The undersigned authorizes the Director to charge the fee specified by 37 C.F.R. §42.15(a) to Deposit Account No. 19-4972, and authorizes payment for any additional fees that might be due in connection with this Petition to be charged to the same Deposit Account.

## II.    <u>STATEMENT OF PRECISE RELIEF REQUESTED</u>

Cancellation of claims 36, 37, 47 and 51 under 35 U.S.C. §102(b) as being anticipated by Takahiro Kiuchi and Shigekoto Kaihara, "C-HTTP - The Development of a Secure, Closed HTTP-based Network on the Internet," published in the Proceedings of SNDSS 1996 (hereinafter "Kiuchi") attached as Ex. 1002.

## III.    <u>FACTUAL BACKGROUND</u>

**A. The Claims Of The '211 Patent Purport To Improve Over Prior Art Domain Name Service Systems By Programming Such Systems To Include Code for "Indicating in Response to the Query Whether The Domain Name Service System Supports Establishing A Secure Communication Link"**

## 1. Admitted Prior Art

Figure 25 of the '211 Patent, labeled "Prior Art" and reproduced below, discloses aspects of domain name service systems that were well known at the time of the patent:



**FIG. 25**
(PRIOR ART)

The '211 patent describes the prior art system of Fig. 25 as including a conventional domain name server (DNS) that provides "a look-up function that returns the IP address of a requested computer or host. For example, when a computer user types in the web name 'Yahoo.com,' the user's web browser transmits a request to a DNS, which converts the name into a four-part IP address that is returned to the user's browser and then used by the browser to contact the destination web site. ... When the user enters the name of a destination host, a

8

request DNS REQ is made (through IP protocol stack 2505) to a DNS 2502 to look up the IP address associated with the name. The DNS returns the IP address DNS RESP to client application 2504, which is then able to use the IP address to communicate with the host 2503 ...." (Ex. 1001, '211 patent, column 38: line 58 to column 39: line 6; Ex. 1004, ¶23)

**2. The Purported Improvement over Prior Art Domain Name Service Systems: Code for "Indicating in Response to the Query Whether the Domain Name Service System Supports Establishing a Secure Communication Link"**

Claim 36 of the '211 patent reads:

36. A non-transitory machine-readable medium comprising instructions executable in a domain name service system the instructions comprising code for:

connecting the domain name service system to a communication network; storing a plurality of domain names and corresponding network addresses; receiving a query for a network address; and indicating in response to the query whether the domain name service system supports establishing a secure communication link.

The program code of the claim enables a domain name service system to satisfy four criteria. The first three -- connecting to a communication network, storing domain names and corresponding network addresses, and receiving queries for network addresses-- were all found in conventional domain name service systems, such as the one described in Fig. 25 of the patent. In addition to being

9

programmed to perform these well-known functions for retrieving IP addresses, the domain name server system executing the code of claim 36 in the '211 patent is thereby programmed for "indicating in response to the query whether the domain name service system supports establishing a secure communication link."

B. **The '211 Patent Does Not Define "Indicating in Response to the Query Whether The Domain Name Service System Supports Establishing A Secure Communication Link" But Discloses Embodiments That Perform Such "Indicating"**

The '211 specification does not use the term "indicate" to show whether a "domain name service system supports establishing a secure communication link" as claimed. Language to this effect first appeared during the prosecution of the parent application 10/714,849 in an amendment filed on July 11, 2007. (Ex. 1006, p.404-419) As part of that amendment, a claim was added for a system that performs the four functions also recited in the current claim. The applicant did not define the claimed "indication," and the examiner allowed the claim without inquiring into what was meant by this term.

Issued claim 36 of the '211 patent was added as numbered claim 39 into the continuation application in the amendment of August 6, 2010. (Ex. 1007, p.943) The examiner responded by noting the specification of the '211 patent application "does not mention or define 'computer readable medium.'"(Ex. 1007, p. 957) The objection was overcome by amending the claim to recite a "non-transitory"

machine readable medium. (Ex. 1007, p. 1096) No further description of the medium was added to the specification.

Looking to the specification, one example of the claimed program code for "indicating in response" is described with respect to Fig. 33:



**FIG. 33**

The example of Fig. 33 shows a domain name service system that includes a secure domain name service (SDNS 3313). (Ex. 1001, 50:27-30) In the example of Fig. 33, "software module 3309 sends a query to SDNS 3313" (Ex. 1001, 50:43-44). In response, "SDNS 3313 returns a secure URL to software module 3309 for the .scom server address for a secure server 3320..." (Ex. 1001, 51:33-

36) The return of the URL containing the domain name with the .scom top level domain indicates the domain name service system supports establishing a secure communication link. This is contrasted with the response of a standard domain name service to the same query. The standard DNS will return a message indicating that the universal resource locator (URL) is unknown. (Ex. 1001, 50:24-27)

As an alternative means for sending the response, the SDNS can be accessed "'in the clear,' that is, without using an administrative VPN communication link."(Ex. 1001, 51:37-39) According to this approach, the reply to the query can be "in the clear." The querying computer can use the clear reply for establishing a VPN link to the desired domain name." (Ex. 1001, '211 patent, 51:44-46). A VPN allows for encrypted private communications. (Ex. 1004, ¶22) Given that the clear reply enables the querying computer to establish a VPN, the clear reply indicates that the domain name service system supports establishing a secure communication link.

Thus, according to the specification, a domain name service system can be programmed to reply in a variety of ways that indicate it supports establishing a secure communication link.

## IV.   CLAIM CONSTRUCTION

### A. Legal Standards

12

The Board interprets a claim by applying its "broadest reasonable construction in light of the specification of the patent in which it appears." 37 C.F.R. §42.100 (b). Claim terms are given their ordinary and accustomed meaning as would be understood by one of ordinary skill in the art, unless the inventor, acting as lexicographer, has set forth a special meaning for a term. *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir.1998); *York Prods., Inc. v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1572 (Fed. Cir. 1996); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005)(en banc). When an inventor acts as a lexicographer, the definition must be set forth with reasonable clarity, deliberateness, and precision. *RenishawPLC v. Marposs Societa per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998); *Garmin Int'l Inc. v.Cuozzo Speed Technologies, Inc.*, IPR2012-00001, Paper 15 (PTAB, Jan. 9, 2013). The '211 patent contains no such special definition of "indicating" and, as such, the term must be given its ordinary and accustomed meaning.

For a claim to deviate from its ordinary and accustomed meaning in response to a disclaimer in the specification, the specification must include "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1365 (Fed. Cir. 2004).

The Board should be leery of a party's arguments that are inconsistent with its arguments in prior litigation. *Cf., Key Pharmaceuticals v. Hercon Laboratories Corp.,* 161 F.3d 709, 715, 48 USPQ2d 1911, 1916 (Fed. Cir. 1998) ("Ordinarily, doctrines of estoppel, waiver, invited error, or the like would prohibit a party from asserting as "error" a position that it had advocated at the trial"). Given that the Board will apply the broadest reasonable construction, a patent owner such as VirnetX who has successfully argued in court for broad claim interpretations should be estopped from advancing narrower constructions in these proceedings. *Cf., Data General Corp. v. Johnson,* 78 F.3d 1556, 1565 (Fed.Cir.1996) ("The doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed."); 18 Susan Bandes & Lawrence B. Solum, Moore's Federal Practice §134-30, at 134-63 (3d ed.1998) (noting that the doctrine of judicial estoppel has been applied broadly to prevent a party from adopting inconsistent legal positions in the same or related judicial proceedings). Instead, those prior statements should help determine the proper meaning of the patent claims in this inter partes review. *See* 35 U.S.C. §301(a)(2), (d) (providing that statements of the patent owner filed in Federal court taking a position on the scope of a patent claim may be used "to determine the proper meaning of a patent claim" in an inter partes review that is ordered or instituted.)

The bounds of a claim should be determined primarily by the claim language. "[I]t is the Patent Owner's burden to precisely define the invention in the claims." *AirCraft Medical LTD. v. Verathon Inc.*, Reexam. Control No. 95/000,161, Appeal 2012-007851, p. 16 (PTAB Dec. 11, 2012)(citing *In re Morris*, 127 F.3d 1048, 1056 (Fed. Cir. 1997)).

New Bay proposes the following broadest reasonable constructions for each of the listed terms from the claims of the '211 patent.

| Proposed Claim Constructions | |
|---|---|
| Domain name | A name corresponding to a network address |
| Top-level domain name | A name used as an ending component in a domain name |
| Domain name service system | A system that performs a lookup service that returns an IP address for a requested domain name and which may include a single device or multiple devices |
| Secure communication link | A direct communication link that provides data security |
| Code for …indicating | Instructions for execution by a computer, such as a server, for serving as a sign or token signifying |
| Transparently | The user need not be involved in creating the secure link |

## B. Domain name

A "domain name" as used in the '211 patent is a name corresponding to a network address. The claim itself indicates that domain names have

"corresponding network addresses." The specification describes "domain name" servers as providing a look-up function that returns "the IP address" of a requested computer or host (Ex. 1001,38:58-60), and uses the term "network addresses" generically and often more specifically refers to "IP addresses." (Ex. 1001, 40:12-13; 50:55-60, numerous others) The specification refers generically to a non-secure domain name such as "website.com." (Ex. 1001, 52:36). The domain names are used to obtain the numerical IP address. "When the user enters the name of a destination host, a request DNS REQ is made … to a DNS 2502 to look up the IP address associated with the name." (*Id.*, 39:1-3)

The '211 patent recognized that new domain names could be readily proposed. For example, the specification teaches alternative secure domain names such as "website.scom." (*Id.*, 52:34)

In *VirnetX v. Microsoft Corporation*, Case No. 6:07 CV 80 (E.D. Tex. 2007), the court construed "domain name" in connection with U.S. Patent 6,502,135, the great grand-parent of the '211 patent. There, Microsoft argued that "domain name" was limited to "*a hierarchical name for a computer under traditional DNS format*." (Ex. 1008, p.14) VirnetX took an opposing position, arguing that "domain name" was not so limited. In its Claim Construction Opinion, the Court sided with VirnetX on this issue, rejecting Microsoft's

proposed construction and construing "domain name" as "a name corresponding to an IP address." (Ex. 1008, p. 12-15)

In *VirnetX Inc. v. Cisco Systems, et al.*, Case No. 6:10cv417 (E.D. Tex.) filed August 11, 2010, the same Court subsequently construed "domain name" in connection with the '211 patent. There, the defendants argued that "domain name" was limited to a "*hierarchical sequence of words in decreasing order of specificity that corresponds to a numerical IP address.*" (Ex. 1013, p. 16) VirnetX took an opposing position, arguing for the same construction that the Court adopted in the prior case against Microsoft. In its Claim Construction Opinion in this later case, the Court again sided with VirnetX on this issue, rejecting defendants' proposed construction and construing "domain name" as "a name corresponding to an IP address." *Id.*

Having succeeded on multiple instances in achieving a broad construction of "domain name" in court, VirnetX is estopped from arguing in these proceedings that the broadest reasonable construction of "domain name" is any narrower than "a name corresponding to an IP address." Given the usage of the term "domain name" in the claims and in the specification, domain name should be construed as "a name corresponding to a network address."

## C. Top-level domain name

A "top-level domain name" is a name used as an ending component in a domain name. "In the situation when computer network 3302 is the Internet, computer 3304 typically will have a standard top-level domain name such as .com, .net, .org, .edu, .mil or .gov." (Ex. 1001, 49:13-17) According to the '211 patent, "each secure computer network address is based on a non-standard top-level domain name." (*Id.*, 7:34-36) The '211 patent proposed names such as .scom, .sorg, .snet, etc. (*Id.*, 7:36-37) but the '211 patent clearly recognized unlimited alternatives: "Alternatively, software module 3409 can replace the top-level domain name of server 3304 with any other non-standard top-level domain name." (*Id.*, 50:21-23)

Given the accepted syntax of a domain name, it is established that the top-level domain name follows the final period or dot. (Ex. 1004, ¶25-26) As indicated in a contemporary patent, those of ordinary skill understood that a "root name or top level domain is the ending suffix on a domain name." (Ex. 1014, 1:54-56) To define a "top-level domain name" as a name used as an ending component in a domain name is consistent with the '211 specification and the understanding of those of ordinary skill in the art at the time of the invention.

## D. Domain name service system

A "domain name service system" is a system for performing a lookup service that returns an IP address for a requested domain name. The specification states: "Conventional Domain Name Servers (DNSs) provide a look-up function that returns the IP address of a requested computer or host. For example, when a computer user types in the web name 'Yahoo.com,' the user's web browser transmits a request to a DNS, which converts the name into a four-part IP address that is returned to the user's browser and then used by the browser to contact the destination web site." (Ex. 1001, '211 Patent, 38:58-64) The domain name service system of dependent claim 40 includes code "for establishing a secure communication link." According to dependent claim 49, "at least one of the plurality of domain names includes a secure name." As described in the specification, a secure domain name service "contains a cross-reference database of secure domain names and corresponding secure network addresses." (Ex. 1001, 50:65-66) Thus, the domain name service system of claim 36 may be used for non-secure domain names and/or for secure domain names.

The "system" is reasonably interpreted to include a single device or multiple devices. The '211 specification states, "Gatekeeper 2603 can be implemented on a separate computer (as shown in FIG. 26) or as a function within modified DNS server 2602... It will be appreciated that the functions of DNS proxy 2610 and

DNS server 2609 can be combined into a single server for convenience. Moreover, although element 2602 is shown as combining the functions of two servers, the two servers can be made to operate independently." (Ex. 1001, 40:19-31).

In *VirnetX v. Microsoft Corporation*, Case No. 6:07 CV 80 (E.D. Tex. 2007), the court construed "domain name service" in connection with U.S. Patent 6,502,135, the great grand-parent of the '211 patent. There, Microsoft argued that "domain name service" was limited to "*the conventional lookup service defined by the Internet Engineering Task Force (IETF)* that returns the IP address of a requested computer or host." (Ex. 1008, p. 11) VirnetX argued that "domain name service" was not limited to the definition provided by the IETF. In its Claim Construction Opinion, the Court sided with VirnetX on this issue, rejecting Microsoft's construction and construing "domain name service" as "a look-up service that returns an IP address for a requested domain name." *Id.*, p. 12. This same construction was subsequently proposed by VirnetX in Case No. 6:10cv417 (Ex. 1005, p. 18) and in the Mitel litigation (Ex. 1009, p. 13).

Having achieved a broad construction of "domain name service" in court, VirnetX is estopped from arguing in these proceedings that the term "domain name service" is specifically limited to the conventional lookup service defined by the IETF. Rather, the broadest reasonable construction of "domain name service"

is more generally "a look-up service that returns an IP address for a requested domain name."

### E. Secure communication link

A "secure communication link" means "a direct communication link that provides data security." This is the construction of "secure communication link" adopted by the district court in Case No. 6:10cv417 . (Ex. 1013, p. 13) As conceded by VirnetX in court filings, "VirnetX did not limit the ordinary scope for this term by assigning it special meaning." (Ex. 1009, VirnetX's Opening Claim Construction Brief, page 12-13). Therefore, the broadest reasonable construction of "secure communication link" should be no narrower than the construction adopted in court.

### F. Code for ...indicating

Although "code" is not described in the specification, the claim defines "code" with its ordinary and accustomed meaning. In particular it is understood from the preamble that the code on the computer readable medium correspond to instructions for execution by the domain name service system. In the '211 patent, code is described by the functions performed by the computer or servers in a system.

Given the lack of any definition in the specification, the term "indicating" must be given its ordinary meaning, namely "serv[ing] as a sign, symptom, or token of; signify[ing]." (Ex. 1010, The American Heritage Dictionary of the English Language) This construction is consistent with the "indicating in response to the query whether the domain name service system supports establishing a secure communication link" disclosed in the specification. *See* Ex. 1001, '211 patent, 51:33-36 (responding by returning a secure URL to the querying software module 3309 indicates that the domain name service system supports establishing a secure communication link); and '211 patent, 51:42-46 (a clear reply sent to the querying computer, which the querying computer can use to establish a VPN link to the desired domain name indicates that the domain name service system supports establishing a secure communication link).

The construction is also consistent with the position taken by VirnetX in securing its infringement verdict against Apple in Case No. 6:10cv417. To show that the Apple FaceTime responds by indicating support for establishing a secure communication link, VirnetX's expert, Dr. Jones pointed to "the accept push message, which is an authentic message from the server, and that message contains information such as the address information at which to contact the other phone ... a session ID ... [and] a certificate name." (Ex. 1016, p. 122) Having successfully mapped messages from a domain name service system for setting up

a secure communication to "indicating in response to the query whether the domain name server supports establishing a secure communication link" in its litigation against Apple, VirnetX is estopped from arguing in these proceedings that such messages are not encompassed within the scope of the claimed "indicating."

VirnetX may point to col. 51, lines 54-56 of the specification which discloses "display[ing] a secure icon indicating that the current communication link to server 3320 is a secure VPN link." (Ex. 1001). But this refers to a web browser displaying an icon. The indication is produced by a web browser rather than by code executed in a domain name service system, as recited in claim 36. The domain name service systems on the secure network 3311 do not play a role in providing the icon nor do they include code for creating the icon (Ex. 1004, ¶29). To the contrary, the icon is produced by software quite distinct from the domain name service system. The icon is therefore not an example of instructions executing in a domain name service system as recited in claim 36.

Also, with respect to the meaning of "indicating," accused infringers of the '211 patent have argued that "indicating" needs to inform a user of a client computer. Such a limitation cannot properly be read into the claims, particularly when applying the broadest reasonable construction. Claim 36 does not recite a user. A query is received but there is no mention or limitation as to where the

query came from. The query received by the domain name service system need not come directly from a user of a web browser or other application at a client computer. Only claims 27 and 51 recite a user, but even these claims do not require that indicating inform the user. To the contrary, these claims require that the user **not** be involved in the establishment of a secure communication link. They recite "configured to enable establishment of a secure communication link between a first location and a second location *transparently to a user* at the first location. Accordingly, the VirnetX was correct to say, "It would be improper to restrict the term "indicator" to a "message or signal," or to require that it "inform [] the user" (Ex. 1009, p. 23).

In order to avoid the prior art, VirnetX has previously argued that the '211 patent disclaims indicating characterized by public keys sent to a requesting host. This argument relies upon statements at column 39, lines 18-29 of the '211 patent (Ex. 1001) describing a conventional scheme for providing virtual private networks. In discussing this prior art, the '211 patent states: "The conventional scheme suffers from certain drawbacks. For example, any user can perform a DNS request. Moreover, DNS requests resolve to the same value for all users." (Ex. 1001, 39:27-29) This passage from the specification, however, does not equate to a disclaimer or disavowal of any aspect of the ordinary and accustomed meaning of "code …for indicating." Given that disclaimers must be express,

however, to the extent there was any disclaimer, it would be strictly limited to conventional systems where (i) any user can perform a DNS request, and (ii) DNS requests resolve to the same value for all users. The Kiuchi prior art discussed below has neither of these characteristics.

### G. Transparently

The term "transparently," of claim 51, is defined in the '211 specification. It means "the user need not be involved in creating the secure link."(Ex. 1001, '211 patent, 40:60-62)

## V. FULL STATEMENT OF THE REASONS FOR CANCELLATION OF CLAIMS IN THE '211 PATENT

### A. Kiuchi is Prior Art That Uses a Domain Name Service in Establishing Secure Communication Links Over the Internet

Kiuchi describes a secure domain name service for connecting a closed group of institutions over the Internet (Ex. 1002, p. 64). The service was contemplated for use by medical institutions for protecting patient information and other private information. (*Id.*)

Kiuchi was presented at the 1996 Symposium on Network and Distributed Systems Security (SNDSS), and published by IEEE in the Proceedings of SNDSS, 1996. Mr. Russell Housley, a speaker at the Symposium and Petitioner's expert, confirms that in 1996 the Kiuchi paper was published in the IEEE Proceedings and

the paper was presented at the Symposium (Ex. 1004, ¶21). Thus, Kiuchi is

without question prior art to the '211 patent pursuant to 35 U.S.C. §102(b).

A block diagram illustrating Kiuchi's system is set forth below:



(Ex. 1004, ¶31)

Kiuchi's system features a C-HTTP name server connected to the Internet

(Ex. 1002, p. 64). For permitted secure communications, this is the server that

responds to name service requests by looking up domain names and returning their

IP address (Ex. 1002, p. 65, sec. 2.3(2)). For non-secure connections, a traditional

DNS name service is used to return IP addresses. (*Id.*; Ex. 1004, ¶35) Thus,

domain name services are provided by the C-HTTP name server for secure

communication requests and by a traditional DNS for non-secure communication

requests.

Kiuchi describes a user in a hospital location sending a request to connect with a computer in a second location. Each location operates its own private network. To go outside the network, communications must go through a firewall (Ex. 1002, p. 64, sec. 2.1). Each institution has a proxy on the firewall. *Id.* The proxy is a computer server that acts as an interface between the computers within the institution's private network and the Internet. The proxy at the requesting computer's institution is referred to as the client-side proxy and the proxy at the target computer's institution is referred to as the server-side proxy. (*Id.*)

The client-side proxy intercepts the request to connect to a domain name from the user agent; the domain name is embedded in a URL. (Ex. 1002, p. 65, sec. 2.3(2); Ex. 1004, ¶24) The client-side proxy sends the requested domain name, referred to as a hostname, to the C-HTTP name server to request the IP address of the host. *Id.* The IP address is returned by the name server only if the requested host is part of the closed network and a secure connection with that host is permitted. *Id.*

When a secure connection is permitted, the C-HTTP name server also returns the public key of the server-side proxy and response Nonce values, along with the IP address. *Id.* Nonce is a mathematical term, which stands for "number used once" or "number once." A fresh Nonce value is created in the C-HTTP name server, on an as-needed basis, for each response, thereby making it irreproducible.

(Ex. 1004, ¶33) By returning the public key and Nonce values along with the IP address, the C-HTTP name server clearly indicates that it supports establishing a secure communication connection.

The client-side proxy uses the public key and Nonce values to create a secure communication connection with the server-side proxy (Ex. 1002, p. 65, sec. 2.3(3)). When the server-side proxy receives the client-side proxy's IP address, the hostname and public key, it authenticates the values and generates a connection ID as well as a second key for response encryption (Ex. 1002, p. 65-6, sec. 2.3(4)). When these are accepted and checked by the client-side proxy, the secure communication connection is established (Ex. 1002, p. 66, sec. 2.3(5)). Security between the proxies is made possible by the public key and Nonce values provided by the C-HTTP name server.

If a secure connection with the requested host is <u>not</u> permitted (e.g., because the requested host is not in the closed network), the name server will have sent back an error status to the client-side proxy. (Ex. 1002, p. 65, sec. 2.3(2)) The client-side proxy then acts exactly like a conventional DNS proxy server; it sends a standard domain name service lookup request asking for the corresponding IP address from a traditional public DNS server. *Id.* Once the IP address is obtained, a typical non-secure communication may take place.

In Kiuchi, the C-HTTP name server is clearly part of a "domain name service system" because it provides a lookup service that returns an IP address for a requested domain name in the closed network. To the extent that Kiuchi makes statements that "DNS" is not used in the C-HTTP system (e.g., "In a C-HTTP-based network, instead of DNS, a C-HTTP-based secure, encrypted name and certification service is used" and "The DNS name service is not used for hostname resolution as the original secure name service, including certification, is used for the C-HTTP-based network" – Ex.1002 at 64)), Kiuchi is simply explaining that a C-HTTP domain name service, as opposed to a conventional DNS (i.e., as defined by the Internet Engineering Task Force (IETF)), is used for resolving IP addresses in the closed network. (Ex. 1004, ¶26) Since the broadest reasonable interpretation of "domain name service system" is not limited to the conventional lookup service as defined by the IETF, these statements in Kiuchi do nothing to diminish the fact that Kiuchi's C-HTTP name server is part of a "domain name service system" within the meaning of the claims, because it provides a lookup service that returns an IP address for a requested domain name.

**B. Claim 36 is Anticipated by Kiuchi**

As set forth in the below claim chart and described in further detail herein, Kiuchi discloses all of the claim limitations of claim 36. Kiuchi is entitled, "C-

HTTP – The Development of a Secure, Closed HTTP-based Network on the Internet." (Ex. 1002) The C-HTTP name server enables a "client-side proxy and server-side proxy [to] communicate with each other using a secure, encrypted protocol…" (Ex. 1002, Kiuchi, p. 64, Abstract) Thus, Kiuchi specifically teaches a domain name server that participates in establishing a secure communication link.

In the pending reexamination brought by Cisco, the parties admitted Kiuchi discloses code for (1) connecting the domain name service system to a communication network, (2) storing a plurality of domain names and corresponding network addresses, and (3) receiving a query for a network address (Ex. 1015, p. 136). The only issue contested by VirnetX has been whether Kiuchi discloses indicating in response to the query whether the domain name service system supports establishing a secure communication link. Treating claim 1 and 36 together the Office stated: "[A]ll limitations in claim 1 are admitted prior art except the final limitation 'indicate in response to the query whether the domain name service system supports establishing a secure communication link.'" (Ex. 1015, p. 647) Nevertheless, for completeness, all of these limitations are discussed below and are shown as satisfied in the claim chart.

In its challenge to the '211 patent, Cisco included a second reference, to Pfaffenberger, in order to address indicating "to a user." The quoted phrase comes

from Cisco's argument discussed in a Markman order from its litigation (Ex. 1015, p. 651-652; Ex. 1013, p. 27), but this extraneous limitation finds no support in the '211 patent.

VirnetX agrees that "the Court should ... not import the 'to the user' limitation." (Ex. 1011, p. 5) The examiner in the Cisco reexamination properly ignored "to the user" when he found that in Kiuchi "[t]he DNS system itself provides an indication of support for secure communication by providing information (public keys, IP address, nonce values) necessary for the query initiator to establish the secure communication with the target" (Ex. 1015, p. 675).

Indeed, the examiner indicated there was no need to rely on Pfaffenberger because there are no deficiencies in Kiuchi to remedy (Ex. 1015, p. 678). Therefore, cancellation on the basis of anticipation by Kiuchi is consistent with the Action Closing Prosecution in the pending Cisco reexamination.

Referring now to claim 36, beginning with the preamble, Kiuchi features a C-HTTP name server. Kiuchi describes computer communications over the Internet. The appendices in Kiuchi set out in detail specifications for the computer communication protocol and the functions performed by a C-HTTP name server. For a server to carry out the communication protocol and the name server functions, it must be suitably programmed. The functions performed by the C-HTTP name server take place when the server reads and executes instructions

maintained in a computer memory generally referred to in claim 36 as non-transitory machine-readable medium. This is the normal operation of computers. The C-HTTP name server, like most every other server communicating on the Internet, necessarily includes a non-transitory machine-readable medium bearing executable instructions in the form of computer program code for controlling its functions. (Ex. 1004, ¶39)

"C-HTTP includes its own secure name service…" (Ex. 1002, p. 68). The "domain name service system" of Kiuchi includes at least the C-HTTP name server. The C-HTTP name server returns an IP address corresponding to a hostname, thereby serving as a domain name service system when a computer in the closed group is the target. The name server resolves hostnames and returns the corresponding IP addresses, thus corresponding to the functions of a domain name service system. (Ex. 1002, p. 65; Ex. 1004, ¶38) Indeed, Kiuchi describes its name server as a secure substitute for a conventional DNS, stating that "In a C-HTTP based network, instead of DNS, a C-HTTP based secure, encrypted name and certification service is used." *Id.*, p. 64, Abstract.

As spelled out in the claim chart, below, each essential element of the challenged claim of the '211 patent is paralleled in functions performed by Kiuchi's secure name server.

The C-HTTP name server is programmed for "connecting to a communication network." The stated objective of the Kiuchi article is "The Development of a Secure, Closed HTTP-based Network on the Internet" (Ex. 1002, Kiuchi title). Section 4.5 of the article weighs the use of privately leased circuits versus implementing a closed network on the Internet. Similarly, in the '211 patent, the Internet 3302 of Fig. 33 is the computer network 3302 through which a communication link is created (Ex. 1001, '211 patent, 49:26-29).

The C-HTTP name server is programmed for "storing a plurality of domain names and corresponding network addresses." Indeed, the C-HTTP name server "includes its own secure name service" (Ex. 1002, Kiuchi, p. 68). It performs name resolution and returns an IP address in response to a request to connect with a permitted hostname. Name resolution is possible because the domain names and the network addresses are stored within the C-HTTP name server. (Ex. 1004, ¶38)

It is impossible to find an IP address in the closed network without the name server, given that the name server contains a certification mechanism preventing any other access to the stored domain names and their IP addresses. (Ex. 1002, p.68) Therefore, the domain names and corresponding network addresses must be stored within the C-HTTP name server for retrieval (Ex. 1004,¶38).

It is well understood that the name server must be programmed to receive queries for an IP address. "A client-side proxy asks the C-HTTP name server whether it can communicate with the host …If the connection is permitted, the C-HTTP name server sends the IP address …" (Ex. 1002, Kiuchi, p. 65). The C-HTTP server thus clearly is configured to receive a query for a network address.

With regard to code for "indicating in response to the query whether the domain name service system supports establishing a secure communication link," Kiuchi discloses a C-HTTP server that comprises program code for responding to "both client-side and server-side proxies with each peer's public key." *Id.* The C-HTTP server generates Nonce values. It also manages "the public keys of all proxies which participate in the closed network." *Id.*

"If the name server confirms that the query is legitimate, it examines whether the requested server-side proxy is registered in the closed network and is permitted to accept the connection from the client-side proxy." *Id.* The C-HTTP server further includes code for responding with "the IP address and public key of the server-side proxy and both request and response Nonce values." *Id.* The public keys and Nonce values are used by the client side proxy and the server-side proxy to establish a secure connection (*Id.*, sec. 2.3, (3-5) Ex. 1004, ¶34). The C-HTTP server is thus programmed to respond to a query with public keys and Nonce values along with the IP address for use in establishing a secure communication

link. The message with the public keys and Nonce values indicates the name server supports establishing a secure communication link (Ex. 1004, ¶37), just like the embodiment in the '211 patent when a clear reply from the domain name service is used by the querying computer to establish a secure communication. (Ex. 1001, 51:42-46)

With regard to the above-discredited argument regarding disavowal or disclaimer, it is further noted that the C-HTTP name server does not fall within the conventional scheme described in the '211 patent. It does not share the drawbacks of a conventional scheme.

Whereas a drawback of the conventional scheme was that public keys may be sent to any requesting user, the C-HTTP server sends a public key and supports establishing a secure communication link only if communication by the requesting host is permitted with the host specified in the request for a connection. (Ex. 1002, p. 65, sec. 2.3(2)) So the C-HTTP server does not support secure communications for any user as in the conventional system, only for a permitted user as in the embodiments of the '211 patent.

Also unlike the conventional scheme, the C-HTTP does not return the same value to all users, but rather includes Nonce values which are, by definition, unique to each request for a connection. (Ex. 1004, ¶33)

Annotations to Kiuchi are set forth below in the claim chart establishing that all limitations in claim 36 are satisfied by Kiuchi.

| **36.** A non-transitory machine-readable medium comprising instructions executable in a domain name service system, the instructions comprising code for: | "The C-HTTP name server, like most every other server communicating on the Internet, necessarily includes a non-transitory machine-readable medium bearing executable instructions in the form of computer program code for controlling its functions. (Ex. 1004, ¶39)<br><br>Kiuchi teaches a domain name service, namely C-HTTP's secure name service:<br><br>"As C-HTTP includes its own *secure name service,* which contains a certification mechanism, it is impossible to know the IP address of a server-side proxy even if its C-HTTP hostname (not necessarily the same as its DNS name) is known and vice versa. The *C-HTTP name service is efficient because it can do name resolution* and host certification simultaneously."<br>(Ex. 1002 at p. 68, emphasis added.)<br><br>Kiuchi describes the secure C-HTTP name server as a replacement for a conventional DNS (Domain Name Server), stating that "[i]n a C-HTTP-based network, instead of a DNS, a C-HTTP-based secure, encrypted name and certification service is used." (Ex. 1002 at p. 64) Thus, the C-HTTP name server is a "domain name service system" as recited in the claim. |
|---|---|
| connecting the domain name service system to a communication network; | Kiuchi discloses developing a closed network on the Internet: "a C-HTTP name server, which manages a given C-HTTP-based network." The C-HTTP name server is connected to the Internet: "In this paper, we discuss the design and implementation of a closed HTTP (Hypertext Transfer Protocol)-based *network* (C-HTTP) which can be *built on the Internet.*" (Ex. 1002 at p. 64, emphasis added.)<br><br>Additionally, the title of the Kiuchi article is "C-HTTP - The |

| | |
|---|---|
| | Development of a Secure, Closed HTTP-based *Network on the Internet.*" (Ex. 1002 at p. 64, emphasis added.)   It is understood that the Internet is a communication network. |
| storing a plurality of domain names and corresponding network addresses; | Kiuchi teaches that the C-HTTP name server performs "lookup of server-side proxy information" (Ex. 1002 at p 65). The C-HTTP name server returns a corresponding IP address (network address) upon looking up a domain name from a URL: |
| | *"A client-side proxy asks the C-HTTP name server whether it can communicate with the host specified in a given URL.* If the name server confirms that the query is legitimate, it examines whether the requested server-side proxy is registered in the closed network and is permitted to accept the connection from the client-side proxy. If the connection is permitted, the *C-HTTP name server sends the IP address* and public key of the server-side proxy and both request and response Nonce values." |
| | (Ex. 1002, at 65, emphasis added.) |
| | The C-HTTP name server must necessarily store a plurality of domain names and corresponding addresses; otherwise it would be unable to provide an IP address in response to a request to communicate with a host (domain name). (Ex. 1004, ¶38) |
| | The C-HTTP name lookup service is used in place of a conventional domain name service (DNS): |
| | "As C-HTTP includes *its own secure name service,* which contains a certification mechanism, it is impossible to know the IP address of a server-side proxy even if its C-HTTP hostname (not necessarily the same as its DNS name) is known and vice versa. The *C-HTTP name service is efficient because it can do name resolution* and host certification simultaneously." |
| | (Ex. 1002 at p. 68, emphasis added.) |

| | |
|---|---|
| | Kiuchi further teaches a process for adding to the stored domain names and corresponding network addresses:<br><br>"When a given institution wants to participate in a closed network, it must 1) install a client-side and/or server-side proxy on its firewall, 2) *register an IP address (for a server-side proxy, a port number should also be registered) and hostname (which does not have to be the same as its DNS name) for a firewall gateway,* 3) give the proxy's public key to the C-HTTP name server, and 4) obtain the C-HTTP name server's public key."<br><br>(Ex. 1002 at 65, emphasis added.) |
| receiving a query for a network address; and | Kiuchi teaches that C-HTTP name server receives a query message requesting the network address of a specified host name:<br><br>"*A client-side proxy asks the C-HTTP name server whether it can communicate with the host specified in a given URL.* If the name server confirms that *the query* is legitimate, it examines whether the requested server-side proxy is registered in the closed network and is permitted to accept the connection from the client-side proxy. If the connection is permitted, the *C-HTTP name server sends the IP address* and public key of the server-side proxy and both request and response Nonce values."<br><br>(Ex. 1002 at 65, emphasis added.)<br><br>Kiuchi teaches a specific message format for transmitting the name service query: |

## 2.1 C-HTTP name service request

C-HTTP-NAME-SERVICE-VERSION\<CR>\<LF>
ENCRYPTION-ALGORITHM\<CR>\<LF>
ENCRYPTED-PART-LENGTH\<CR>\<LF>
SIGNATURE-ALGORITHM\<CR>\<LF>
SIGNATURE-LENGTH\<CR>\<LF>
MESSAGE-DIGEST-ALGORITHM\<CR>\<LF>
\<CR>\<LF>
*REQUEST-TYPE\<CR>\<LF>
*CLIENT-SIDE-PROXY-IP\<CR>\<LF>
*USER-AGENT-IP\<CR>\<LF>
*SERVER-SIDE-PROXY-NAME\<CR>\<LF>
*SERVER-SIDE-PROXY-PORT\<CR>\<LF>
\<CR>\<LF>
*DIGITAL-SIGNATURE

(Ex. 1002 at 73.)

Kiuchi also provides an example name service request using
this format to request the network address of domain name
"Coordinating.Center.CSCRG":

| | |
|---|---|
| | **a. Lookup of server-side proxy information (C-HTTP name service protocol)**<br><br>C-HTTPNS/0.1<CR><LF><br>RSA<CR><LF><br>74<CR><LF><br>RSA<CR><LF><br>32<CR><LF><br>MD5<CR><LF><br><CR><LF><br>\*SERVER<CR><LF><br>\*130.69.111.111<CR><LF><br>\*192.168.123.123<CR><LF><br>\*Coordinating.Center.CSCRG<CR><LF><br>\*8080<CR><LF><br><CR><LF><br>\*827ae79ba214769ea2998249bdb9aa97<br><br><br><br>(Ex. 1002 at 73.) |
| indicating in response to the query whether the domain name service system supports establishing a secure communication link. | "A client-side proxy asks the C-HTTP name server whether it can communicate with the host specified in a given URL. ... If the connection is permitted, *the C-HTTP name server sends the IP address and public key of the server-side proxy and both request and response Nonce values.*"<br><br>(Ex. 1002 at 65, emphasis added.)<br><br>Kiuchi teaches that "the C-HTTP name server provides both client-side and server-side proxies with each peer's public key. In addition, Nonce values for both request and response are also generated and provided by the C-HTTP name server." (Ex. 1002 at 65)<br>"The client-side proxy uses the public key and Nonce values to create a secure communication connection with the server-side proxy." (Ex. 1004, ¶34) (Ex. 1002 at 65-66)<br>Responding with an IP address and with public keys and Nonce values for establishing secure communication links |

indicates that the name server supports establishing a secure communication link. (Ex. 1004, ¶37)

Kiuchi teaches establishing a secure communication link.

Specifically, Kiuchi describes "the design and implementation of a closed HTTP (Hypertext Transfer Protocol)-based network (C-HTTP)." (Ex. 1002, Kiuchi at 64.) C-HTTP "provides *secure HTTP communication mechanisms within a closed group of institutions* on the Internet, where each member is protected by its own firewall."  (Ex. 1002, Abstract at 64, emphasis added.) The institutions "communicate with each other using a *secure, encrypted protocol." (Id.,* emphasis added.)

Kiuchi further describes that a "client-side proxy and server-side proxy communicate with each other using a secure, encrypted protocol." (Ex. 1002 at 64.) To further enhance the security, "Both the request to and response from *the CHTTP name server* are encrypted and certified, using asymmetric key encryption and digital signature technology."(Ex. 1002 at 65, emphasis added.)

In view of the above discussion and chart, all elements of claim 36 are disclosed by Kiuchi, and claim 36 should therefore be rejected for anticipation.

## C. Claim 37 is Anticipated by Kiuchi

Claim 37 depends from claim 36 and further requires that one of the domain names stored in the domain name service system include a top-level domain name. Kiuchi discloses storing for lookup the client-side proxy University.of.Tokyo.Branch.Hospital and the server side proxy

Coordinating.Center.CSCRG. Each of these domain names includes a top-level

domain name, i.e., Hospital and CSCRG. (Ex. 1004, ¶36)

| | |
|---|---|
| **37.** The non-transitory machine-readable medium of claim 36, wherein the instructions comprise code for | See analysis of claim 36 above. |
| storing the plurality of domain names and corresponding network addresses including at least one top-level domain name. | Kiuchi teaches that domain names that include a top-level domain name. For example, as shown in Kiuchi Appendix 3, a client-side proxy is identified by the domain name "University.of.Tokyo.Branch.Hospital," which includes a top-level domain name of "Hospital". Similarly, a secure server-side proxy is identified by the domain name "Coordinating.Center.CSCRG," which includes a top-level domain name "CSCRG": |

## Appendix 3. Examples of C-HTTP communication (a-h)

Note that lines with an asterisk are encrypted. Components of C-HTTP-based communication are as follows:

1) Client-side proxy
   hostname: University.of.Tokyo.Branch.Hospital
   IP address: 130.69.111.111
2) server-side proxy
   hostname: Coordinating.Center.CSCRG
   IP address: 130.69.222.222
   port number: 8080
3) C-HTTP name server:
   Name.Server.CSCRG
   IP address: 130.69.222.111
4) User agent:
   IP address: 192.168.123.123

(Ex. 1002 at p. 73)

Therefore, Kiuchi satisfies all of the limitations in claim 37, and claim 37 should be rejected for anticipation.

### D. Claim 47 is Anticipated by Kiuchi

Claim 47 depends from claim 36 and further requires "code for authenticating the query." Kiuchi is replete with references to use of encryption in the authentication of name service requests received by the C-HTTP name server. Kiuchi explicitly uses: "electronic signature for the request/response

43

authentication." (Ex. 1002, p. 64, sec. 2.2(3)) "Both the request to and response

from the C-HTTP name server are encrypted and certified, using asymmetric key

encryption and digital signature technology." (Ex. 1002, p. 65, sec. 2.3(2))

| **47.** The non-transitory machine-readable medium of claim 36, wherein the instructions comprise code for | See analysis of claim 36 above. |
|---|---|
| authenticating the query for the network address. | Kiuchi teaches authenticating requests for IP addresses using cryptographic techniques (Ex. 1004,¶40). "Both the request to and response from the C-HTTP name server are *encrypted and certified,* using asymmetric key encryption and digital signature technology." (Kiuchi at 65, emphasis added.) Kiuchi further teaches that the secure C-HTTP name server authenticates queries received from a client:<br><br>"In C-HTTP, five kinds of security technologies are used. They are: 1) asymmetric key encryption for the secure exchange of data encryption keys between two types of proxies and host information between a proxy and C-HTTP name server, 2) symmetric key encryption for the encryption of C-HTTP encrypted headers and HTP/1.0 requests, 3) *electronic signature for the request/response authentication,* 4) a one-way hash function for checking data tampering and 5) random key generation technology."<br><br>(Ex. 1002 at 64, emphasis added.)<br><br>Kiuchi teaches that each secure C-HTTP name service request includes a digital signature used to authenticate the query: |

> **2.1 C-HTTP name service request**
>
> C-HTTP-NAME-SERVICE-VERSION\<CR\>\<LF\>
> ENCRYPTION-ALGORITHM\<CR\>\<LF\>
> ENCRYPTED-PART-LENGTH\<CR\>\<LF\>
> SIGNATURE-ALGORITHM\<CR\>\<LF\>
> SIGNATURE-LENGTH\<CR\>\<LF\>
> MESSAGE-DIGEST-ALGORITHM\<CR\>\<LF\>
>
> \<CR\>\<LF\>
> *REQUEST-TYPE\<CR\>\<LF\>
> *CLIENT-SIDE-PROXY-IP\<CR\>\<LF\>
> *USER-AGENT-IP\<CR\>\<LF\>
> *SERVER-SIDE-PROXY-NAME\<CR\>\<LF\>
> *SERVER-SIDE-PROXY-PORT\<CR\>\<LF\>
>
> \<CR\>\<LF\>
> *DIGITAL-SIGNATURE

(Ex. 1002 at 72)

Given the explicit disclosure of authenticating the name service request, Kiuchi satisfies all of the limitations in claim 47, and claim 47 should be rejected for anticipation.

### E. Claim 51 is Anticipated by Kiuchi

Claim 51 depends from claim 36. As explained above, Kiuchi discloses all of the limitations of claim 36. In addition, claim 51 requires that the domain name service system be "configured to enable establishment of a secure communication link between a first location and a second location transparently to a user at the

first location." The public keys and Nonce values provided by the C-HTTP name server of Kiuchi enable the establishment of a secure communication link between the client-side proxy of a first location and the server-side proxy of a second location. A user at the first location is not made aware of the security protection procedures. (Ex. 1004, ¶41) The secure communication link is established transparently to any user at the first location. Specific supporting citations to these design details for the C-HTTP name server are set forth in the below claim chart.

| 51. The non-transitory machine-readable medium of claim 36, | See the discussion of claim 36. |
|---|---|
| wherein the domain name service system is configured to enable establishment of a secure communication link between a first location and a second location | Kiuchi teaches that the secure C-HTTP name service enables establishing a secure communication link between the client-side proxy (at the first location) and the server-side proxy (at the second location).<br><br>For example, the secure C-HTTP name service provides the public key of the server-side proxy to the client-side proxy, along with Nonce values that are also used to create a connection between the client- and server side proxies:<br><br>"If the connection is permitted, the C-HTTP name server sends the IP address and public key of the server-side proxy and both request and response Nonce values."<br><br>(Ex. 1002 at 65.)<br><br>The client-side proxy then initiates a secure communication link to the server-side proxy:<br><br>"When the C-HTTP name server confirms that the specified server-side proxy is an appropriate closed network member, |

| | a *client-side proxy sends a request for connection to the server-side proxy, which is encrypted* using the server-side proxy's public key and contains the client-side proxy's IP address, hostname, request Nonce value and symmetric data exchange key for request encryption." |
|---|---|
| | (Ex. 1002 at 65, emphasis added.) |
| | The secure C-HTTP name service also provides the public key of the client-side proxy to the server-side proxy, along with the Nonce values: |
| | "If access is permitted, the C-HTTP name server sends the IP address and public key of the client-side proxy and both request and response Nonce values, which are the same as those sent to the client-side proxy." |
| | (Ex. 1002 at 66.) |
| | By providing the public keys and Nonce values to the client- and server-side proxies, the secure C-HTTP name service enables establishment of a secure communication link between them. See also Ex. 1002, p. 65, sec. 2.3 (3-5) |
| transparently to a user at the first location. | Kiuchi further teaches that the secure communication link is established transparently to a user, indeed transparently to all end-users: |
| | "Negotiations concerning type and representation of objects are done between an origin server and user agent, using HTTP/1.0. As for these negotiations, *C-HTTP is transparent* to both of them.... *End-users do not have to employ security protection procedures.* They do not even have to be conscious of using C-HTTP based communications." |
| | (Ex. 1002 at 68 (emphasis added)). |

Given that Kiuchi satisfies all of the limitations in claim 51, claim 51 should be rejected for anticipation.

## VI.   **CONCLUSION**

For the foregoing reasons, there is a reasonable likelihood that Petitioner will prevail as to the unpatentability of each of claims 36, 37, 47 and 51. Inter partes review should therefore be instituted against all these claims of the '211 patent on all of the above-stated grounds.

Respectfully submitted,

Date: June 23, 2013                   /Robert M. Asher, #30,445/

Robert M. Asher, Reg. No. 30,445
Jeffrey T. Klayman, Reg. No. 39,250
Sunstein Kann Murphy & Timbers LLP
125 Summer Street, 11th Floor
Boston, MA 02110-1618
(617) 443-9292
Attorneys for Petitioner, New Bay Capital, LLC.

## CERTIFICATE OF SERVICE

The undersigned certifies service pursuant to 37 C.F.R. §§42.6(e) and

42.105(b) on the Patent Owner by overnight delivery service by Airport Courier

Service of East Boston, MA of a copy of this Petition for Inter Partes Review and

supporting materials in their entirety at the correspondence address of record for

the '211 patent:

> Finnegan, Henderson, Farabow, Garrett & Dunner LLP
> 901 New York Avenue, NW
> Washington, DC 20001-4413

Date: June 23, 2013

        /Robert M. Asher/
Robert M. Asher, Reg. No. 30,445

03959/05004 1895008.1

49